GUILLERMO TELLO, IVETTE RIVERA, demandantes y recurrentes, *v.* EASTERN AIRLINES, INC., demandada y recurrida.

*Números:* RE-85-57  *Resueltos:* 16 de junio de 1987
O-85-75

84

*Ana Luisa Díaz de Pérez,* abogada de los recurrentes; *Francisco Ponsa Flores,* abogado de la recurrida.

EL JUEZ ASOCIADO SEÑOR ORTIZ emitió la opinión del Tribunal.

Ivette Rivera y Guillermo Tello, compraron unos boletos a la Eastern Airlines para viajar de San Juan a Santo Domingo y de regreso a San Juan. El 30 de septiembre de 1982, día del viaje de regreso a San Juan, cuando esperaban para abordar el vuelo 949 de dicha línea aérea, procedente de Miami, un agente de la compañía aérea les informó que el vuelo no haría escala en Santo Domingo debido a una "avería o desperfecto mecánico inesperado". Después que el avión había salido de Miami con destino hacia Santo Domingo, y mientras volaba a 33,000 pies de altura, fue necesario apagar uno de los motores de dicho avión que súbitamente perdió potencia.

Ante esa situación inesperada Eastern hizo los arreglos para ofrecerle transportación a todos los pasajeros que tenían boletos para viajar a San Juan. Para ello contrató un avión Convair de la línea Prinair que estuvo disponible a las 8:30 p.m.[1] como sustituto. Por razones personales los demandantes se negaron a abordar dicho avión.[2]

En su demanda los demandantes alegaban que la recurrida no le ofreció a los recurrentes las debidas atenciones de cuidado, alimentación, albergue y/o traslado en otro avión similar al averiado, lo cual causó "graves daños

---

[1] La hora de salida del avión de Eastern, de haber llegado a Santo Domingo, era a las 4:50 p.m.

[2] Estos son los hechos estimados probados por el tribunal al dictar sentencia sumaria en que se declara sin lugar la demanda.

y perjuicios físicos y angustias mentales" a los demandantes; que, además, tuvieron que pernoctar en el Aeropuerto Internacional de Santo Domingo, a la intemperie, lo cual también "les causó graves daños y perjuicios y angustias mentales".

Eastern presentó moción para que se dictara sentencia sumariamente. Los demandantes presentaron oposición acompañada de memorando de derecho el 10 de julio de 1984. Luego de la vista sobre la referida moción y de recibir escritos adicionales, el tribunal de instancia dictó sentencia sumaria a favor de Eastern. Ivette Rivera y Guillermo Tello recurrieron a este foro. Acordamos revisar y consolidamos los recursos de revisión y apelación.

I

La moción de sentencia sumaria persigue el propósito de obtener un remedio rápido y eficaz por vía de sentencia cuando la parte que lo promueve puede acreditar ante el tribunal que no existe una controversia genuina con relación a los hechos materiales del litigio. R. Hernández Colón, *Manual de Derecho Procesal Civil*, 2da ed., New Hampshire, Equity Pub. Corp., 1981, pág. 202. Si los hechos no están en controversia y el pleito sólo presenta una cuestión de derecho, está en orden disponer del asunto mediante sentencia sumaria de conformidad con la Regla 36 de Procedimiento Civil, 32 L.P.R.A. Ap. III. *Mercado Riera* v. *Mercado Riera*, 87 D.P.R. 566, 567 (1963).

Ahora bien, la parte que solicite que se dicte sentencia sumaria en un litigio está en la obligación de demostrar, fuera de toda duda, la inexistencia de una controversia real sobre todo hecho pertinente que a la luz del derecho sustantivo aplicable determinaría una sentencia a su favor como cuestión de ley. *Roth* v. *Lugo*, 87 D.P.R. 386, 397 (1963).

■ La parte opositora para derrotar la solicitud de sentencia sumaria debe presentar, como regla general, contradeclaraciones juradas y contradocumentos que pongan en controversia los hechos presentados por el promovente.

En el caso de autos, la parte recurrente argumenta que los hechos alegados por ella en la demanda, fueron negados por la parte recurrida en su contestación a la demanda y por ello "existe una controversia sobre los hechos del caso que el Tribunal de Instancia tiene que resolver en una vista en su fondo y no mediante una sentencia sumaria". No le asiste la razón.

En este caso no hay controversia de hecho. Las determinaciones de hechos están ampliamente sostenidas por las constancias de los autos. No hay base para resolver que procesalmente no procedía que se dictara sentencia sumaria. *Corp. Presiding Bishop CJC of LDS* v. *Purcell,* 117 D.P.R. 714 (1986).

## II

■ No hay disputa de que el vuelo de los recurrentes era "internacional" según se define el término por el Art. 1, Sec. 2 del Tratado de Varsovia de 1929.[3] Estados Unidos efectuó su adhesión al Tratado en 1934 y no excluyó a Puerto Rico de su aplicación, según lo permite el Tratado en el Art. 40.[4] Por lo tanto, la existencia de este tratado rige

---

[3] 49 Stat. 3000 *et seq.,* TS 876 (49 U.S.C. sec. 1502 *et seq.*).

[4] "1. Las Altas Partes Contratantes podrán, en el momento de la firma del depósito de las ratificaciones o de su adhesión, declarar que la aceptación por ellas prestada al presente Convenio no se aplicará a todas o parte de sus colonias, protectorados, territorios bajo mandato o cualquier otro territorio sometido a su soberanía o su autoridad, o a cualquier otro territorio bajo su jurisdicción.

"2. En su consecuencia, podrán ulteriormente adherirse separadamente en nombre de todas o parte de sus colonias, protectorados, territorios bajo mandato o cualquier otro territorio sometido a su soberanía o su autoridad, o cualquier otro bajo su jurisdicción que hubieren sido excluidos en su primitiva declaración.

los hechos expuestos. *Canales* v. *Pan American,* 112 D.P.R. 329, 332 (1982).

Argumenta la parte recurrente que las disposiciones del Convenio de Varsovia "suplantan otras legislaciones locales o estatales", y que por esa razón no son válidas las disposiciones de la Regla 17 de la tarifa de Eastern Airlines, aprobada por la Junta de Aeronáutica Civil, en las cuales parcialmente se basó el Tribunal Superior para dictar la sentencia objeto de este recurso. Debemos, pues, determinar qué efecto tiene la aplicación del Tratado sobre la limitación de responsabilidad que forma parte de las tarifas de Eastern y que ha sido incorporada, en parte, en los boletos de los pasajeros.

■ Hay que dejar consignado que el Tratado de Varsovia es autoejecutable. *Trans World Airline* v. *Franklin Mint Corp.,* 466 U.S. 243, 80 L.Ed.2d 273, 281 (1984), y es la ley suprema en el problema central que presenta este caso.

La siguiente regla forma parte de las tarifas de Eastern (Passenger Tariff No. PR-3) vigentes el día de los hechos en este caso:

(B) CANCELLATIONS:

(1) Carrier may, without notice, substitute alternate carriers or aircraft.

(2) (Not applicable to CO/SL for transportation wholly between points in the U.S.) Carrier may, without notice cancel, terminate, divert, postpone or delay any flight or the further right of carriage or reservation of traffic accommodations and determine if any departure or landing should be made, without any liability except to refund in accordance

---

"3. Podrán también, conformándose a sus disposiciones, denunciar el presente Convenio separadamente o para todas o parte de sus colonias, protectorados, territorios bajo mandato o cualquier otro territorio sometido a su soberanía o autoridad, o cualquier otro territorio sometido a su jurisdicción."

with its tariffs the fare and baggage charges for any unused portion of the ticket if it would be advisable to [do] so:

(a) because of any fact beyond its control (including, but without limitation, meteorological conditions, acts of God, force majeure, strikes, riots, civil commotions, embargoes, wars, hostilities, disturbances, or unsettled International conditions) actual, threatened or reported or because of any delay, demand, condition, circumstances or requirement due, directly or indirectly, to such fact; or

(b) because of any fact not to be foreseen, anticipated or predicted; or

(c) because of any government regulation, demand or requirement; or

(d) because of shortage of labor, fuel or facilities, or labor difficulties of carrier or others. (Énfasis suprimido.) Sentencia Sumaria, pág. 45.

Los Arts. 19 y 20 del Tratado de Varsovia disponen lo siguiente:(5)

*Art. 19.* El porteador es responsable del daño ocasionado por retrasos en el transporte aéreo de viajeros, mercancías o equipaje.

*Art. 20.* 1. El porteador no será responsable si prueba que él y sus comisionados han tomado todas las medidas necesarias para evitar el daño o que les fue imposible tomarlas.

2. En el transporte de mercancías y equipajes, el porteador no será responsable si prueba que el daño proviene de falta de pilotaje, de conducción de la aeronave o de navegación, y que en todos los demás aspectos él y sus agentes han tomado todas las medidas necesarias para evitar el daño.

■ La contención de los recurrentes es que el Art. 19, *supra,* establece una responsabilidad "absoluta" de parte del transportista por lo que basta probar que hubo un retraso en el transporte y que el pasajero sufrió daños por dicho

---

(5) Véase E. Mapelli, *El Contrato de Transporte Aéreo Internacional,* Madrid, Ed. Tecnos, 1968, págs. 309–319.

retraso para que la línea aérea (transportista) responda por los mismos. No tiene razón. El Art. 20 del Tratado, *supra,* expresa las condiciones bajo las cuales el transportista no es responsable.

Anterior al Acuerdo de Montreal[6] el referido Art. 20 era una defensa para el transportista en casos de reclamaciones bajo el Tratado de Varsovia. Luego, a raíz del referido acuerdo, el transportista no tiene que aprovecharse necesariamente de dichas defensas si desea estar protegido por las limitaciones de responsabilidad estipuladas en el Acuerdo de Montreal:

> ... The parties further agree to provide in their tariffs that the Carrier shall not, with respect to any claim arising out of the death, wounding, or other bodily injury of passenger, avail itself of any defense under Article 20(1) of the Convention or the Convention as amended by the Protocol. 49 U.S.C. sec. 1502.

Podemos colegir de la nota transcrita que el Acuerdo de Montreal está relacionado únicamente con daños corporales y la muerte de los pasajeros. No dice nada sobre la aplicabilidad del Art. 20 como defensa de las reclamaciones por razón de retrasos en los vuelos. Por ello es forzoso concluir que las defensas disponibles bajo el Art. 20(1) siguen en efecto para el caso de retraso en los vuelos. Más aún, recientemente el Tribunal Supremo de Estados Unidos expresó lo siguiente sobre la supuesta "responsabilidad absoluta" del Art. 20(1):

> It is true that one purpose of the Montreal Agreement was to speed settlement and facilitate passenger recovery, but the parties to the Montreal Agreement promoted that purpose

---

(6) El Tratado de Varsovia fue modificado por el Protocolo de la Haya de 28 de septiembre de 1955 y otros acuerdos. Estados Unidos no es parte de esos otros convenios, a excepción del Acuerdo de Montreal. 49 U.S.C. sec. 1502, págs. 437–438 (1976); *Canales* v. *Pan American,* 112 D.P.R. 329, 332 (1982).

by specific provision for waiver of the Article 20(1) defenses. They did not waive other provisions in the Convention that operate to qualify liability, such as the contributory negligence defense of Article 21 or the "accident" requirement of Article 17. See *Warsaw*, 442 F. Supp., at 408. Under the Warsaw Convention as modified by the Montreal Agreement, liability can accordingly be viewed as "absolute" only in the sense that an airline cannot defend a claim on the ground that it took all necessary measures to avoid the injury. *Air France* v. *Saks*, 470 U.S. 392, 84 L.Ed.2d 289, 301–302 (1985).[7]

En cuanto a la relación del Tratado de Varsovia y otros estatutos, la jurisprudencia más reciente ha sostenido que las teorías de reclamaciones y responsabilidades expresadas en el tratado son exclusivas y ocupan el campo de las acciones estatales bajo el derecho común en situaciones donde aplica el Tratado. *Boehringer-Mannheim Diagnostics* v. *Pan Am. World*, 737 F.2d 456, 458 (5to Cir. 1984). (En este caso se dijo que el tratado crea una causa de acción y es el remedio exclusivo.) *Benjamins* v. *British European Airways*, 572 F.2d 913 (2do Cir. 1978); *Abramson* v. *Japan Airlines Co., Ltd.*, 739 F.2d 130 (3er Cir. 1984); *In re Mexico City Aircrash of October 31, 1979*, 708 F.2d 400 (9no Cir. 1983). Estas decisiones son consecuentes con el propósito unificador del Tratado. Ello es importante porque no "estamos interpretando una pieza legislativa ordinaria. Estamos interpretando un tratado, que aspira al logro de un sentido uniforme entre países con sistemas

---

[7] Lo que ha de entenderse por "medidas necesarias", que responde también a la idea inglesa de la *due diligence*, o sea, que la *diligence raisonnable*, es cumplir con una prudencia media todas las obligaciones que impone la ley. Véanse, para una discusión sobre esto, Minutes, *Second International Conference on Private Aeronautical Law* (Trad. de R. C. Horner y D. Legrez), New Jersey, Ed. Fred B. Rothman, 1975; E. Mapelli, *El contrato de transporte aéreo internacional*, Madrid, Ed. Tecnos, 1968, págs. 182–190.

jurídicos diversos". *Canales* v. *Pan American*, supra, pág. 336.

La realidad del presente caso es que los recurrentes *no* reclaman daños ocasionados por el retraso que hubo entre la hora a la cual originalmente estaba programado para salir el vuelo desde Santo Domingo hacia San Juan, y la hora en que salió el avión que más tarde transportó a los pasajeros y en el cual los recurrentes se negaron a viajar.[8] El vuelo de los recurrentes estaba programado para salir desde Santo Domingo hacia San Juan a las 4:50 p.m. Ante la avería inesperada Eastern contrató otro avión en el cual los recurrentes pudieron haber viajado a San Juan ese mismo día, unas horas más tarde.

Aunque los daños reclamados no surgen del referido retraso, el Art. 20, *supra*, dispone que el transportista no será responsable del daño ocasionado por retrasos en el transporte aéreo de pasajeros si prueba que ha tomado "todas las medidas necesarias para evitar el daño". Consideramos que Eastern cumplió con la obligación que tenía hacia los recurrentes en las circunstancias que existían en ese momento y, por lo tanto, no es responsable por los daños que puedan haber sufrido los recurrentes luego de que ellos decidieron unilateralmente no utilizar la transportación, alternativa que tenían disponible.

El Art. 25 del Tratado expone las circunstancias en que el transportista no podrá valerse de las disposiciones del convenio limitativas de su responsabilidad:

1. El porteador no tendrá derecho a prevalecer de las disposiciones del presente Convenio que excluyen o limitan su responsabilidad si el daño proviene por su dolo o de faltas

---

[8] Los recurrentes dicen que ellos no consideraban "seguro" el avión, pero no se ofreció prueba sobre ello ni se cuestionó la válidez del certificado de aeronavegabilidad. Se limitan a decir que era más pequeño que el avión sustituido.

que, con arreglo a la Ley del Tribunal que entiende en el asunto, se consideren como equivalentes a dolo.

2. Les será igualmente rehusado este derecho si el daño ha sido causado en las mismas condiciones por uno de sus agentes obrando en el ejercicio de sus funciones.

■ De la disposición transcrita surge que los límites de responsabilidad previstos en el convenio no se aplicarán si media dolo al provenir el daño. En el presente caso la tardanza del vuelo no se debió a actuación dolosa,[9] como alegan los recurrentes, sino a factores imprevistos.

■ El Tratado dispone, además, en su Art. 21 lo siguiente:

En el caso de que el porteador probare que la persona lesionada ha sido causante del daño o ha contribuido al mismo, el Tribunal podrá, con arreglo a las disposiciones de su propia Ley, descartar o atenuar la responsabilidad del porteador.

De conformidad con la anterior disposición tampoco Eastern es responsable por los daños que reclaman los recurrentes, ya que según hemos dicho, los daños resultaron de la decisión que tomaron los propios recurrentes de permanecer en Santo Domingo en lugar de viajar a San Juan.

Resolvemos que la recurrida, al poner otra transportación a la disposición de los recurrentes, tomó las "medidas necesarias" para evitar los daños que éstos ahora reclaman. El tribunal de instancia actuó correctamente al eximirlos de responsabilidad.

El último planteamiento es con relación a una solicitud para que se suspendieran los efectos de la sentencia en cuestión hasta mitad del mes de marzo de 1985. La abogada de los recurrentes alega que para el mes de enero de 1985,

---

[9] Sobre el dolo en nuestro derecho, y su aplicabilidad en casos como el de autos, véase *Canales* v. *Pan American,* supra, pág. 329.

cuando se dictó sentencia, estaba a punto de dar a luz, y al serle denegada la referida solicitud se le ha prohibido "ejercer [su] profesión libremente por razón de sexo". La contención además de portentosa es tan frívola que no merece considerarse.

Por las razones expuestas, *la sentencia recurrida será confirmada.*

Los Jueces Asociados Señores Negrón García, Rebollo López y Alonso Alonso concurren en el resultado sin opinión escrita.