Colón Birriel, Juez Ponente
*903 TEXTO COMPLETO DE LA SENTENCIA
I
El apelante Emiliano Gándara Alós ("Gándara") interesa la revisión de la sentencia sumaria emitida por el Tribunal de Primera Instancia, Sala Superior de Caguas, el 21 de julio de 1996. Mediante el referido dictamen se declaró con lugar la demanda que por Cobro de Dinero presentara el apelado C. López Sanabria ("López Sanabria") contra Gándara.
Es menester hacer un recuento de los incidentes pertinentes acontecidos antes de que López Sanabria presentara su demanda para la correcta solución al recurso. Veamos. Surge de los escritos, que el 7 de diciembre de 1989, Gándara, por conducto de los licenciados Marcelino Meléndez La Fontaine y Tadeo Negrón Medero, presentó ante el antiguo Tribunal Superior, Sala de Caguas, demanda sobre "División y Partición de Herencia" contra la Sucesión de Don Narciso E. Gándara Díaz ("Sucesión") de la que Gándara tiene participación de una sexta (1/6) parte en el caudal hereditario. La Sucesión, además de Gándara, está compuesta por sus hermanos, hijos de doble vínculo del causante, Norma E. Narciso E., Emilio, de apellidos Gándara Alós y de su viuda Doña Carmen Alós, respecto a su derecho a la cuota usufructuaria que le corresponde en ley.
El caudal hereditario de la Sucesión lo compone dos (2) inmuebles situados en el Barrio Turabo de Caguas, P.R., con una cabida de dos (2) cuerdas, el primero y de una (1) cuerda el segundo equivalentes aproximadamente a 11,791.20 metros cuadrados, los que se encuentran inscritos como fincas separadas en el Registro de la Propiedad de Caguas. A la fecha de la presentación de la demanda, el caudal hereditario no había sido dividido y liquidado encontrándose éste bajo la administración y control de los co-herederos, Emilio y Norma E. Gándara Alós. Gándara le solicitó al tribunal, entre otras cosas, que se dividiera y se liquidara su participación en la herencia que tiene junto a los demás co-herederos. 
Por su parte, los demandados Norma E. Gándara Alós, Narciso E. Gándara Alós y Carmen Alós representados por la Leda.. Cristina Muñoz Gándara, contestaron la demanda alegando entre otras cosas, tener también interés y necesidad de que se dividiera y liquidafá su participación en la herencia. Alegaron estar en el proceso de obtener y evaluar ofertas'de'cbmpra relacionadas a la propiedad, tener interés de dividir y liquidar su participación en la herencia y que, antes de que Gándara presentara la demanda y con el conocimiento de éste, habían iniciado ciertos trámites conducentes a la venta, tales como mesura y avalúo de la propiedad y la contratación de un corredor de bienes raíces. 
El 17 de abril de 1990, los miembros de la Sucesión Gándara firmaron un contrato de "Autorización de Venta" con los corredores C. López Sanabria & Asociados, representados por López Sanabria, confiriéndole a éstos el derecho exclusivo de vender la propiedad con cabida de 10,720 3357 metros cuadrados a razón de $150.00 por metro cuadrado. Si la Sucesión o cualquier otra *904 persona o entidad vendiera la propiedad dentro del término original de un año fijado en el contrato, vendría obligada a pagar a los corredores la comisión estipulada en el contrato de cinco por ciento (5%) del precio total de la venta.
Los corredores recibirían igual comisión del cinco por ciento (5%) del precio total de la venta, si la propiedad fuere vendida a persona o entidad alguna con las cuales los corredores hubiesen negociado vigente el contrato original de un (1) año y así lo hubieran notificado a la Sucesión. La propiedad no pudo ser vendida vigente el contrato, ni al año posterior de su vencimiento. 
El 15 de enero de 1992 el Ledo. Negrón Medero por encomienda de Gándara, le envió una carta certificada a la Leda. Muñoz Gándara, representante legal de López Sanabria, ofreciéndole la participación de Gándara en la propiedad de la Sucesión por la suma de $180,000.00 en lugar de $218,333.33 que representaba el valor en el mercado de su participación, de acuerdo a la tasación efectuada por el Ingeniero Tasador, Jaime Isern Piñero, quien determinó que el valor total de la propiedad en el mercado era de $1,310,000.00. El Ledo. Negrón Medero le informó, además, que de no recibirse comunicación dentro de los treinta (30) días siguientes al recibo de la comunicación se procedería a solicitar al foro de instancia el nombramiento de un contador partidor. Esta oferta no fue aceptada por los demás co-herederos.
El 28 de enero de 1993 se celebró la Conferencia con Antelación al Juicio en el caso pendiente sobre División y Partición de Herencia. Surge de la minuta preparada en ese día, que los miembros de la Sucesión comparecieron representados por sus respectivos abogados. El tribunal les concedió diez (10) días para escoger un corredor y firmar un contrato para la venta de la propiedad, contrato que debería tener una cláusula especificando que la venta se llevaría a cabo en sesenta (60) días y de no ser así se vendería la propiedad en pública subasta. 
El 16 de febrero de 1993, en cumplimiento con lo ordenado por el tribunal, los miembros de la Sucesión firmaron con Roosevelt Realty Group, representada por Enrique Colls un contrato de "Autorización de Venta Exclusiva", por el término de sesenta (60) días, para vender la propiedad inmueble de la Sucesión por el precio de $1,310,000.00 con una comisión del cinco por ciento (5%) del valor total de la venta. De expirar el término original de noventa (90) días acordado para el contrato si la propiedad le fuera vendida a alguna persona o entidad con la que los corredores hubiesen negociado durante la vigencia del contrato y así lo hubieran notificado a la Sucesión, ésta vendría obligada a pagar la referida comisión del cinco por ciento (5%). 
El 17 de febrero de 1993, Enrique Colls, en representación de Roosevelt Realty Group, le cursó comunicación a la Leda.. Cristina Muñoz Gándara, informándole que entre las personas como clientes potenciales para la compra de la propiedad a venderse se encontraba el Sr. Edwin Colón, del Caguas Institute of Mechanical Technology, Inc. ("Mech Tech"). 
La primera oferta que recibe la Sucesión para la compra de la propiedad es a través de Enrique Colls, de Roosevelt Realty Group, mediante comunicación de fecha 20 de mayo de 1993 que le hizo el Ledo. Fernando Cruz Tolinche en representación de Mech Tech, quien ofreció, entre otras cosas, la suma de $750,000 00 por la propiedad. [8] Esta oferta fue rechazada. 
Así las cosas, con fecha de 14 de septiembre de 1993, la Sucesión y C. López Sanabria & Asociados, representada ésta por C. López Sanabria suscribieron un contrato de "Autorización de Venta", el que se lee como sigue:

"AUTORIZACION DE VENTA

—DE UNA PARTE: LA SUCESION GANDARA ALOS, compuesta por Doña Carmen Alós Vda. de Gándara y sus hijos Emilio, Narciso y Norma, todos de apellido Gándara Alós respectivamente vecinos de San Juan, P.R. y Nueva York, USA, en lo adelante designados como LA PROPIETARIA.-

—DE OTRA PARTE: C. LOPEZ SANABRIA & ASOCIADOS, con oficina en Caguas, Puerto Rico, en lo adelante designado como LOS CORREDORES.—

*905 —ACUERDAN-Que en consideración a los servicios de CORREDORES, LA PROPIETARIA confiere a los mismos el derecho exclusivo de vender, por el término de QUINCE (15) DIAS la propiedad que se describe a continuación:...Predio de terreno con cabida de 10,720.3357 metros cuadrados según mensura de Ing. Justo Rivas Martínez, localizada en el Barrio Turabo, Sector Punto Pijo, en la Antigua Carretera Estatal Número 1, hoy la Calle Gautier Benitez de Caguas P.R. y que colinda por su lado Sur, en parte, con el Correo (US Post Office).-
—PRECIO DE VENTA: Se ofrecerá a razón de no menos de $150.00 dólares por metro cuadrado.-

—LA PROPIETARIA se obliga a pagar a LOS CORREDORES el CINCO (5%) POR CIENTO de comisión del precio total de la venta, en el momento de la firma de la escritura aunque la fecha de esta firma sea posterior al término señalado siempre que LOS CORREDORES encuentren un Comprador para la referida propiedad dentro del término mencionado, y dicho Comprador deposite la suma que se estipule en su momento entre LA PROPIETARIA y el Comprador por concepto de opción de compra, o si la misma fuera vendida, dentro de dicho término por LA PROPIETARIA. LA PROPIETARIA se obliga a cooperar con LOS CORREDORES en sus gestiones y además facilitar los documentos necesarios para la venta.

—LOS CORREDORES se comprometen a inspeccionar cuidadosamente la propiedad para obtener toda la información necesaria, cuyos detalles suministrados por LA PROPIETARIA al dorso, forman parte de este convenio, manteniéndolo informado de los progresos de las gestiones de venta y en definitiva a realizar gestiones procedentes para lograr, en su caso la venta referida..

—Toda oferta de venta está sujeta a la aprobación final del Tribunal Superior del Estado Libre Asociado, (ELA), Sala de Caguas. -

—El o los depósitos entregados por el Comprador será(n) retenido(s) por LOS CORREDORES en una cuenta especial de reserva hasta el cierre o firma de escrituras y se aplicará el pago de la comisión —En caso de que el comprador pierda el dinero depositado por incumplimiento de contrato de opción o compra-venta, este depósito se dividirá de la siguiente manera: UN CINCUENTA (50%) POR CIENTO para LA PROPIETARIA y un CINCUENTA (50%) POR CIENTO para EL CORREDOR, sin que exceda el monto de la comisión.-.

—San Juan, Puerto Rico, a 14 de septiembre de 1993".

El 15 de septiembre de 1993, la Junta de Directores de la Cooperativa de Ahorro y Crédito La Merced por conducto de su Presidente Ejecutivo, Juan O. Sánchez, le cursó comunicación a C. López Sanabria & Asociados, donde le hicieron una oferta para la compra de la propiedad a los miembros de la Sucesión por la suma de $1,150,000 00. 
En respuesta a la anterior comunicación, el 12 de octubre de 1993, López Sanabria le envió por correo y vía fax una comunicación al señor Sánchez informándole, entre otras cosas, que en reunión celebrada entre los abogados de los herederos de la sucesión consideraron favorablemente su oferta. Este le informó, además, que por estar la heredera principal (Doña Carmen Alós Vda. de Gándara) incapacitada, se necesitaba una orden del Tribunal Superior para efectuar la transacción y a esos fines se iba a celebrar una vista el 15 de octubre de 1993. 
Luego de que el extinto Tribunal Superior de Puerto Rico, Sala de San Juan, Caso Civil Núm. KEX-92-0035 (703), mediante su resolución de 13 de mayo de 1992, declarara incapaz a Doña Carmen Alós Santoni Vda. de Gándara y nombrara como su tutora a su hija, Norma Gándara Alós, se solicitó autorización judicial para vender la propiedad de la Sucesión. Mediante resolución de 30 de noviembre de 1993 el Tribunal Superior, Sala de Caguas, caso Civil Núm. EAC89-2619, autorizó que la propiedad de la Sucesión fuera vendida en pública subasta por un precio mínimo de $1,150,000.00. El 15 de diciembre de 1993, se expidió el Mandamiento de Ejecución y el Edicto de Venta en Pública Subasta. 
*906 Surge del Escrito de Apelación, que alegadamente, a mediados de diciembre de 1993, la representación legal de Gándara recibió una llamada telefónica del Ledo. Femando Cruz Tolinche, en representación de Caguas Institute of Mechanical Technology ("Mech Tech"), ofreciendo la suma de $193,000.00 por la participación hereditaria correspondiente a Gándara en la Sucesión.
Así las cosas, el 3 de enero de 1994, en San Juan, Puerto Rico, Gándara otorgó la Escritura Número Uno (1) sobre Declaración y Cesión de Derechos y Acciones Hereditarias ante el Notario Público Iván Pagán Hernández, en donde le cedió sus derechos y acciones hereditarias a Caguas Institute of Mechanical Technology representada por su Presidente José Colón Merced, por la suma de $193,000.00. 
Aunque no es parte de la controversia ante nos, surge del Escrito de Apelación que el 29 de marzo de 1994, al enterarse Enrique Coll que Gándara había vendido su participación en la herencia de la Sucesión, le envió comunicación a éste exigiéndole el pago de $9,650.00, equivalente al cinco por ciento (5%) de la comisión que le adeudaba conforme al documento que habían suscrito. Ante esta situación, el 19 de abril de 1994, la representación legal de Gándara, Ledo. Negrón Medero le cursó comunicación a Enrique Coll, negando su reclamación. 
El 14 de marzo de 1994, López Sanabria por conducto del Ledo. Ismael Marín Hernández presentó demanda de cobro de dinero contra Gándara, ante el Tribunal de Distrito, Sala de Guaynabo. [19] Alegó, entre otras cosas, que el 14 de septiembre de 1993, Gándara, en unión a otros miembros de la Sucesión, convinieron con él, el derecho exclusivo de vender un predio de terreno de la referida Sucesión, del cual Gándara tenía un condominio equivalente a una sexta parte (1/6); que la comisión pactada por concepto de honorarios en su capacidad de corredor de bienes raíces era de un cinco por ciento (5%); que cumplió con los términos del contrato al proveerle a Gándara un comprador, quien efectivamente vendió su participación por la suma de $193,000.00; que tenía derecho a que Gándara le satisfaciera su comisión del cinco por ciento (5%), equivalente a $9,650.00; que la participación de Gándara fue vendida a José Colón Merced en calidad de presidente del Caguas Institute of Medical (Mechanical) Technology, mediante la escritura Número Uno (1), otorgada el 23 de enero de 1994 en San Juan, P.R., ante el Notario Iván Pagán Hernández.
Posteriormente, la demanda fue trasladada al Tribunal de Distrito, Sala de Caguas.
El 14 de julio de 1994, Gándara, por conducto del Ledo. Negrón Medero, procedió a contestar la demanda. Alegó que la demanda era improcedente en derecho, por lo que en su día debía de desestimarse aduciendo: que el contrato en controversia tenía efectividad por un término de quince (15) días a partir de la fecha de su otorgamiento, 14 de septiembre de 1993; que dicho contrato no contenía cláusula alguna que obligara a los miembros de la Sucesión a tener que pagar comisión a López, de la propiedad venderse después de transcurridos los quince (15) días de efectividad del contrato; que el contrato se refería única y exclusivamente a la venta de la propiedad de la Sucesión descrita en el contrato, venta que aún no se había realizado; que la escritura de Cesión de Derechos y Acciones Hereditarias otorgada por Gándara con el Caguas Institute of Mechanical Technology no tenía relación alguna con el contrato mencionado en la demanda; y que las conversaciones y negociaciones entre Gándara y el Caguas Institute of Mechanical Technology se originaron en diciembre de 1993, entre la representación legal de Gándara y el abogado de dicha entidad Ledo. Fernando Cruz Tolinche.
El 14 de octubre de 1994, se efectuó la Conferencia con Antelación al Juicio, en la que López Sanabria solicitó tiempo adicional para enmendar su informe. El tribunal accedió a la petición de López Sanabria, sometiéndose un informe enmendado sobre conferencia preliminar entre abogados, el 30 de noviembre de 1994. En esa ocasión se acordó con el tribunal que ambas partes someterían escritos respecto a si procedía desestimarse la demanda o dictarse sentencia sumaria.
El 24 de enero de 1995, López Sanabria presentó ante el Tribunal de Distrito, Sala de Caguas "Solicitud de Sentencia Sumaria". En síntesis, alegó que el 27 de septiembre de 1993 recibió comunicación de Edwin Colón, Vice Presidente de Mech Tech, haciéndole una oferta de un $1,000,000.00 por la propiedad de la Sucesión; que la Leda. Cristina Muñoz Gándara lo autorizó, mediante comunicación de 4 de octubre de 1993, a que a nombre de la Sucesión le ofreciera a Mech *907 Tech, por conducto de Edwin Colón, la propiedad bajo los términos expresados en el escrito; que solicitara una mejor oferta de $1,150,000.00; que el 4 de octubre de 1993, se dirigió mediante comunicación a Edwin Colón indicándole sobre el mandato que había recibido de la Leda. Muñoz Gándara; que el 8 de octubre de 1993, José Colón Merced, Presidente de Mech Tech se dirigió por su conducto a la Sucesión informándole entre otras cosas, que estaba en posición de igualar cualquier oferta razonable que pudiera hacer otra parte interesada; que ese mismo día la Leda. Muñoz Gándara contestó dicha comunicación; que el 21 de octubre de 1993, ésta se dirigió mediante comunicación a José Colón Merced devolviéndole un cheque por $10,000.00 informándole que López le informó claramente la naturaleza de la oferta que de estar interesado debería mejorar; que el 28 de octubre de 1993, Mech Tech por conducto de su presidente, José Colón Merced, le envió una comunicación a la Leda. Cristina Muñoz Gándara, con copia a él, solicitando una reunión entre las partes para ultimar detalles relacionados con el proceso de compraventa de la propiedad; que el 3 de enero de 1994, Gándara otorgó una escritura en la que cedió o vendió su participación de una 1/6 por la suma de $193,000 00 a Mech Tech. 
Por otro lado, el 25 de enero de 1995 Gándara presentó ante el Tribunal su "Memorando de Derecho Para Sostener la Desestimación de la Demanda". [30] Alegó, entre otras cosas, que la causa de acción que se exponía en la demanda se basaba en un contrato que López Sanabria había firmado el 14 de septiembre de 1993, con la Sucesión; que no se alegaba ni se reclamaba en la demanda que López Sanabria hubiese hecho contrato alguno con él en su carácter personal; que el predio de terreno, que dio origen al contrato, no había sido vendido a nadie; que él mediante la Escritura Número Uno (1) sobre Declaración y Cesión de Derechos y Acciones Hereditarias, otorgada el 3 de enero de 1994, le cedió sus derechos hereditarios a Caguas Institute of Mechanical Technology Inc; que, por ende, la demanda incoada contra Gándara es improcedente en derecho. Así las cosas, López Sanabria presentó el 31 de mayo de 1995 "Moción en Oposición a Moción Solicitando Desestimación". 
Ante esta situación, el Tribunal de Primera Instancia, Sub-sección de Distrito, Sala de Caguas, emitió una Orden el 29 de junio de 1995, notificada el 20 de julio de 1995, mediante la cual declaró "No Ha Lugar tanto la Solicitud de Sentencia Sumaria así como la de Desestimación". Dicha orden advino final y firme sin que ninguna de las partes solicitara su revisión.
No obstante, el 7 de febrero de 1996, López Sanabria con una nueva representación legal, la Leda. Maricarmen Almodóvar Díaz, presentó ante el Tribunal de Primera Instancia, Sub-sección de Distrito, Sala de Caguas, otra "Solicitud de Sentencia Sumaria”, alegando y argumentando en esencia lo mismo que en su primera moción, aunque de forma más detallada, profunda y extensa. Entre las alegaciones de esta segunda moción, se expresó que López Sanabria entendió que el silencio de Gándara ante el tiempo que tuvo disponible para examinar los hechos estipulables propuestos por él, conforme la Orden del Tribunal del 2 de octubre de 1995, así como los documentos que lo sustentaban, sólo podía interpretarse como una anuencia de los mismos. Asimismo señaló que alegadamente su primera gestión en virtud de su contrato de corretaje fue el de iniciar conversaciones con Edwin Colón el 17 de abril de 1989. Gándara, por su parte, presentó el 22 de febrero de 1996. "Moción en Oposición a Solicitud de Sentencia Sumaria". En dicha moción, Gándara alegó, en síntesis, que la controversia en torno a si como cuestión de derecho procedía o no dictar sentencia sumaria a favor de López Sanabria, ya había sido resuelta por el tribunal mediante su Orden del 3 de julio de 1995, notificada el 20 de julio de 1995, mediante la cual se declaró "No Ha Lugar" la Moción de Sentencia Sumaria presentada por López Sanabria; que dicha Orden advino final y firme por no haber éste solicitado reconsideración ni revisión de la misma; que el mero hecho de que las partes no se hubiesen puesto de acuerdo para estipular unos hechos no daba margen ni justificaba una solicitud de sentencia sumaria; que como cuestión de realidad entendía que basándose en la contestación a la demanda, las defensas afirmativas levantadas y su teoría expuesta en el informe sometido al tribunal, ninguno de los hechos en controversia podían ser estipulados por Gándara; y que la única controversia entre las partes era lo que se exponía en el párrafo cuarto de la demanda en cuanto a si existía o no un contrato, si López Sanabria cumplió con el mismo y si Gándara al ceder sus derechos hereditarios venía obligado a pagar alguna comisión a López Sanabria.
Con el beneficio de los escritos de las partes, el 21. de junio de 1996, el Tribunal de Primera Instancia, Sala Superior de Caguas, dictó Sentencia Sumaria, archivándose en los autos copia de su notificación el 27 de agosto de 1996. En la página 13 de la referida sentencia, el tribunal, luego de *908 exponer los hechos relevantes, expresó que "[sjencillamente concluimos que el demandado se benefició de dichas gestiones logrando su interés, hacer líquido el valor de su participación en el inmueble. Aun cuando resolviéramos que no se llegó a la venta de la participación hereditaria en virtud del contrato de corretaje, el sentido de justicia y equidad nos impide ignorar que el demandado se beneficio [sic] gracias a los esfuerzos del demandante. No reconocerle compensación al demandante seria [sic] auspiciar que el demandado se enriquezca injustamente". Declaró con lugar la demanda, condenó a Gándara a pagarle a López $9,650.00, más las costas y gastos de los procedimientos, más el interés legal al 9.75% a partir de la fecha de la sentencia.
Inconforme, Gándara apela ante nos de la sentencia, imputándole al Tribunal de Primera Instancia el haber cometido cinco (5) errores: (1) Erró el tribunal al disponer del caso sin celebrar un juicio en sus méritos; (2) erró al admitir y utilizar como fundamento en su Sentencia documentos y argumentos que no tienen relevancia ni pertinencia a los hechos del caso, pudiendo ser refutados en una vista en sus méritos; (3) erró al dictar Sentencia Sumaria ignorando los hechos que están en controversia; (4) erró al no establecer en su Sentencia determinaciones de hechos y conclusiones de derecho, como lo exige el debido proceso de ley y la jurisprudencia; (5) erró al recibir y aceptar la segunda Solicitud de Sentencia Sumaria de López y negarse a aplicar a la misma la doctrina de la ley del caso.
II
Por estar íntimamente relacionados los primeros tres errores los discutiremos conjuntamente. Primeramente, expondremos el alcance de la solicitud de sentencia sumaria luego, si existe controversia real sustancial en los hechos materiales del caso y si como cuestión de derecho procedía que se dictara dicha sentencia. Veamos.
La moción de sentencia sumaria persigue el propósito de obtener un remedio rápido y eficaz por vía de sentencia cuando la parte que lo promueve puede acreditar ante el tribunal que no existe una controversia genuina con relación a los hechos materiales del litigio. Si los hechos no están en controversia y el pleito sólo presenta una cuestión de derecho, está en orden disponer del asunto mediante sentencia sumaria de conformidad con la Regla 36 de Procedimiento Civil, Ap. Ill, R. 36; Tello Rivera v. Eastern Airlines 119 D.P.R. 83, 86 (1987). La Regla 36.3 de las de Procedimiento Civil, 32 L.P.R.A. Ap. III, R.36.3, dispone en lo pertinente:
La sentencia solicitada se dictará inmediatamente si las alegaciones, disposiciones [deposiciones], contestaciones a interrogatorios y admisiones ofrecidas en unión a las declaraciones juradas, si las hubiere, demostraren que no hay controversia real sustancial en cuanto a ningún hecho material y que como cuestión de derecho debe dictarse sentencia sumaria a favor de la parte promovente.
La moción para que se dicte sentencia sumaria deberá ir acompañada de documentos que avalen los hechos que sustentan la posición de la parte que la solicita. El tribunal al entender en la moción no dirime credibilidad; presume ciertos los hechos no controvertidos. Colegio de Ingenieros y Agrimensores de Puerto Rico v. Autoridad de Acueductos y Alcantarillados, _ D.P.R. _ (1992), 92 J.T.S. 137.
. , La controversia de hecho material tiene que ser bona fide para que se justifique denegar la sentencia sumaria por tal fundamento. Valcourt Questell v. Tribunal Superior, 89 D.P.R. 827, 832 (1964).
Como regla general para derrotar una solicitud de sentencia sumaria la parte opositora debe presentar contradeclaraciones juradas y contradocumentos que pongan en controversia los hechos presentados por el promovente. Si se cruza de brazos corre el riesgo que le dicten sentencia en su contra sin la celebración de un juicio en su fondo. Sin embargo, el sólo hecho de no haberse opuesto con evidencia que controvierta la presentada por el promovente no implica que necesariamente proceda la sentencia sumaria o que el promovente tenga derecho a que se dicte a su favor. Consejo de Titulares del Condominio Parkside v. MGIC Financial Corporation, _ D.P.R. _ (1991), 91 J.T.S. 54, pág. 8669.
El tribunal, al considerar una moción de sentencia sumaria analizará los hechos de la forma más favorable a la parte que se opone y dictará sentencia, según proceda en derecho. Colegio de Ingenieros *909 y Agrimensores v. Autoridad de Acueductos y Alcantarillados, supra.
El objetivo de aligerar la tramitación de un caso no puede derrotar el principio fundamental de todo proceso ante un tribunal: alcanzar una solución justa. Al dictar sentencia sumaria no se pueden poner en peligro o lesionar los intereses de las partes. Por eso, si existen dudas sobre la existencia de una controversia de hechos éstas deben resolverse en contra de la parte que solicita la sentencia sumaria. PFZ Properties Inc. v. General Accident Insurance Company P.R. Ltd., _ D.P.R. _ (1994), 94 J.T.S. 116, pág. 125.
Al dictar sentencia sumaria el tribunal deberá: (1) analizar los documentos que acompañan la moción solicitando la sentencia sumaria y los documentos incluidos con la moción en oposición y aquellos que obren en el expediente del Tribunal, (2) determinar si el oponente controvirtió algún hecho material o si hay alegaciones de la demanda que no han sido controvertidas o refutadas en forma alguna por los documentos.
El tribunal no deberá dictar sentencia sumaria cuando: (1) existen hechos materiales no controvertidos; (2) hay alegaciones afirmativas en la demanda que no han sido refutadas; (3) surge de los propios documentos que se acompañan con la moción una controversia real sobre algún hecho material; o (4) como cuestión de derecho no procede. PFZ Properties Inc. v. General Accident Insurance Company P.R. Ltd., supra. Luego de expuesto el derecho aplicable a la moción de sentencia sumaria y de examinados detenidamente los escritos ante nos entendemos que el Tribunal de Primera Instancia erró al dictar sentencia sumaria en el caso de marras, por existir controversia sobre hechos materiales. Veamos.
La controversia en el caso bajo nuestra consideración versa en cuanto a si existe o no un contrato de corretaje, de existir si López Sanabria cumplió con el mismo y si Gándara al ceder sus derechos hereditarios al Institute of Mechanical Technology, viene obligado a pagarle comisión a López Sanabria a virtud del contrato. De los escritos sometidos por las partes a la consideración del foro de instancia, no se podía concluir que existiera el contrato de corretaje al momento de Gándara ceder sus derechos hereditarios, ni mucho menos que dicho contrato incluyera además de la venta de la propiedad de la Sucesión, la venta del derecho hereditario de uno de los coherederos. Asimismo, está en controversia quién comenzó las negociaciones con el Institute of Mechanical Technology y desde cuándo. Ya hemos mencionado que el objetivo de aligerar la tramitación de un caso no puede derrotar el principio fundamental de todo proceso ante un tribunal: alcanzar una solución justa. Por ende, al existir dudas sobre la existencia de una controversia de hechos éstas deben resolverse en contra de la parte que solicita la sentencia sumaria. PFZ Properties, Inc. v. General Accident Insurance Company, supra. Por lo tanto, erró el Tribunal de Primera Instancia al dictar la sentencia sumaria sin tomar en consideración los hechos que estaban en controversia.
En el cuarto señalamiento de error, Gándara alega que erró el foro de instancia al no hacer especificar los hechos probados y sus conclusiones de derecho. No tiene razón. Veamos.
La Regla 43.2 (a) de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 43.2 (a), dispone en su parte pertinente que "[n]o será necesario especificar [el tribunal] los hechos probados y consignar separadamente las conclusiones de derecho"; "[a]l resolver mociones bajo las Reglas 10 ó 36 o al resolver cualquier otra moción, a excepción de lo dispuesto en la regla 39.2.".
Sin embargo, es sabido que la Regla 43.3 de Procedimiento Civil, 32 L.P.R.A. Ap III, R 43.3, dispone sobre el mecanismo para una parte solicitar enmiendas o determinaciones iniciales o adicionales de hechos o conclusiones de derecho en el evento de que una parte en el caso vaya a apelar y dicha parte considere que están incompletas o no se han hecho inicialmente por el tribunal de conformidad con el último párrafo de la Regla 43.2 de Procedimiento Civil, supra.
La referida Regla 43.3 dispone en lo pertinente que "[n]o será necesario solicitar que se consignen determinaciones de hechos a los efectos de una apelación, pero a moción de parte presentada a más tardar diez (10) días después de haberse archivado en autos copia de la notificación de la sentencia, el tribunal podrá hacer las determinaciones de hechos y conclusiones de derecho iniciales correspondientes, si es que éstas no se hubieren hecho por ser innecesarias, de acuerdo a la Regla *910 43.2 o podrá enmendar o hacer determinaciones adicionales, y podrá enmendar la sentencia de conformidad".
La Sentencia apelada a pesar de no tener identificada apropiadamente las determinaciones de hechos y las conclusiones de derecho, sí tiene una relación de los hechos probados y las conclusiones de derecho que el foro de instancia entendió que era el aplicable. En todo caso Gándara al estar inconforme con esas determinaciones y conclusiones, tenía como remedio adecuado solicitar ante el Tribunal de Primera Instancia determinaciones de hechos y conclusiones de derecho adicionales, conforme a las disposiciones de la Regla 43.3, supra. De los escritos ante nos no se desprende que Gándara haya solicitado oportunamente determinaciones de hechos y conclusiones de derecho. Por tanto, el foro de instancia no cometió el error señalado.
Gándara señala en su quinto y último señalamiento, que el Tribunal de Primera Instancia erró al recibir y aceptar la segunda solicitud de sentencia sumaria y al negarse a aplicar a la misma la doctrina de la ley del caso. Veamos de qué trata la doctrina de la "ley del caso" y si aplica al caso ante nuestra consideración.
Cuando se pretende utilizar la doctrina de la "ley del caso", basada en órdenes anteriores sobre la acción posterior de la corte que la dictara en el mismo caso, no podemos perder de vista que dicha doctrina meramente expresa la práctica de los tribunales en rehusar volver a abrir en discusión lo que ha sido decidido, y no una limitación a sus facultades. Martorel v. J. Ochoa, 25 D.P.R. 759 (1917).
"La doctrina de la "ley. del caso" es una manifestación necesaria y conveniente del principio reconocido de que las adjudicaciones deben tener fin. Es reconocida generalmente la norma de que las determinaciones de un tribunal apelativo constituyen la "ley del caso" en todas aquellas cuestiones consideradas y decididas y generalmente obligan tanto al tribunal de instancia como al que las dictó si el caso vuelve a su consideración. Se dice generalmente ya que se reconoce que cuando un tribunal se convence de que la ley del caso establecida es errónea y que podría causar una grave injusticia, debe de tener el poder de aplicar una norma de derecho diferente con el propósito de resolver el caso que tiene ante su consideración en una forma justa”. (Enfasis suplido). Srio. del Trabajo v. Tribunal Superior, 95 D.P.R. 136 (1967).
Por otro lado, una sentencia sumaria, "por constituir una decisión en los méritos, es precedente de cosa juzgada cuando se opone entre partes debidamente relacionadas. La denegación de una moción de sentencia sumaria, sin embargo, no va más allá de establecer la ley del caso para una ulterior moción basada precisamente en los mismos fundamentos." (Enfasis suplido). Sucn. Meléndez v. DACO, 112 D.P.R. 86 (1982).
De la doctrina expuesta sobre la "ley del caso" se desprende que es discrecional aplicarla, ya que el tribunal tiene el poder de aplicar una norma de derecho diferente con el propósito de resolver el caso que tiene ante su consideración en una forma justa Srio. del Trabajo v. Tribunal Superior, 95 D.P.R. 136 (1967)
Siendo discrecional su aplicación, y en ausencia elementos para concluir que el foro de instancia abusara de su discreción, no vamos a intervenir con la actuación de dicho foro al no aplicar la "ley del caso".
Resolvemos que existen en el presente caso controversias de hechos materiales, por lo que no se puede disponer del mismo vía sentencia sumaria. Por tanto, se revoca la Sentencia dictada por el Tribunal de Primera Instancia, Sala Superior de Caguas, el 21 de julio de 1996 y se devuelve el caso a dicho foro para procedimientos consistentes con lo aquí resuelto.
Lo pronunció el Tribunal y lo certifica la señora Secretaria General.
Aida Ileana Oquendo Graulau
Secretaria General
*911 ESCOLIOS 98 DTA 50
1. Exhibit XI, pág. 69 del Escrito de Apelación.
2. Exhibit XH, pág. 71-72 del Escrito de Apelación.
3. Exhibit XIV, pág. 74 del Escrito de Apelación.
4. Exhibit XV, págs. 75-76 del Escrito de Apelación.
5. Exhibit XVI, págs. 77-78 del Escrito de Apelación
6. Exhibit XVm, págs. 79-80 del Escrito de Apelación.
7. Exhibit XIX, págs. 83-84 del Escrito de Apelación.
8. Exhibit XX, pág. 86 del Escrito de Apelación.
9. Exhibit XXI y XXII, págs. 87-88 del Escrito de Apelación.
10. Exhibit XXni, pág. 89 del Escrito de Apelación.
11. Exhibit XXV, pág. 91 del Escrito de Apelación.
12. Exhibit XXVI, págs. 92-93 del Escrito de Apelación.
13. Exhibit XXVn, págs. 94-98 del Escrito de Apelación.
14. Exhibit XXVIII, págs. 99-101 del Escrito de Apelación.
15. Exhibit XXIX, págs. 102-103 y Exhibit XXX, págs. 104-105 del Escrito de Apelación.
16. Exhibit XXXI, págs. 106-111, del Escrito de Apelación.
17. Exhibit XXXH, pág. 112 del Escrito de Apelación
18. Exhibit XXXffl, pág. 113 del Escrito de Apelación.
19. Exhibit 1, págs. 1-2 del Escrito de Apelación.
20. Exhibit II, págs. 3 y 4 del Escrito de Apelación.
21. Exhibit III, págs. 5-10 del Escrito de Apelación.
22. Exhibit IV, págs. 11-14 del Escrito de Apelación.
23. Exhibit 5, pág. 36 del Alegato del Apelado.
24. En la Solicitud de Sentencia Sumaria presentada por López Sanabria, éste alegó que la Leda. Cristina Muñoz Gándara le pidió, mediante comunicación del 4 de octubre de 1993, que consiguiera mejorar la oferta de $1,050,000.00 por la venta de la propiedad de la Sucesión. Sin embargo, del Exhibit 6, pág. 37 del alegato de los apelados surge de la referida carta, que se debe mejorar la oferta de $1,150,000.00, en lugar de un $1,050,000.00 como alegó López Sanabria.
*912 25. Exhibit VII, pág. 38, Alegato del Apelado
26. Exhibit 8, págs. 39-40, Alegato del Apelado.
27. Exhibit X, pág. 42 Alegato del Apelado.
28. Exhibit XI, pág. 43 del Alegato del Apelado.
29. Exhibit XII, págs. 44-48 del Alegato del Apelado.
30. Exhibit V, págs. 15-23 del Escrito de Apelación.
31. Exhibit VI, págs. 24-34 del Escrito de Apelación.
32. Exhibit VII, pág. 35 del Escrito de Apelación.
33. Exhibit VIII, págs. 36-52 del Escrito de Apelación.
34. De los escritos ante nos, no surge evidencia de las conversaciones que se iniciaron el 17 de abril de 1989, con el representante de Mech Tech, Edwin Colón.
35. Exhibit IX, pág. 53 del Escrito de Apelación.
36. Exhibit X, págs. 56-68 del Escrito de Apelación.