Fiol Matta, Jueza Ponente
*810 TEXTO COMPLETO DE LA SENTENCIA
Se nos solicita la revocación de la sentencia dictada sumariamente por la Sala Superior de San Juan del Tribunal de Primera Instancia el 10 de julio de 2000 que declaró con lugar la sentencia declaratoria solicitada y expidió auto de Mandamus contra la Administración de Corrección. Por los fundamentos que pasamos a discutir, confirmamos la sentencia apelada.
I
El señor Angel Santos Serrano (en adelante, "Santos") cumple una condena de 99 años de reclusión por infracción al artículo 83 del Código Penal, asesinato en primer grado e infracción a los artículos 6 y 8 de la Ley de Armas, desde el 25 de octubre de 1991. Fue clasificado en custodia mediana el 21 de septiembre de 1994, lo cual fue ratificado el 9 de marzo de 1999. El 16 de marzo de 1999, Santos solicitó a la Administración de Corrección (en adelante, "Corrección") que evaluara nuevamente su clasificación correccional. El 13 de septiembre, Corrección ratificó la clasificación de Santos en custodia mediana, aduciendo poco tiempo en confinamiento en dicha clasificación.
Santos instó la demanda de epígrafe el 7 de marzo de 2000, alegando que el proceso utilizado para su reclasificación violaba sus derechos civiles y solicitando que se ordenara a Corrección y a sus funcionarios que reconocieran las garantías procesales contenidas en la Ley de Procedimiento Administrativo Uniforme (L.P.A.U.) durante el proceso de reclasificación de custodia. Además, reclamó compensación en daños por violación a sus derechos civiles. El 14 de marzo de 2000, Santos solicitó al tribunal de instancia que paralizara los procedimientos administrativos, y el 31 de marzo de 2000, durante una vista celebrada para dilucidar dicha solicitud, las partes acordaron que se citara a la Directora del Area Social de Ponce Adultos para que presentara un informe sobre el ajuste y progreso de Santos. La solicitud de paralización quedó pendiente y se señaló una nueva vista para el 5 de mayo de 2000. Lo anterior quedó plasmado en una orden del tribunal fechada el 31 de marzo de 2000.
Pendiente de celebrarse la vista señalada, Corrección ratificó, por tercera vez, la clasificación de custodia mediana de Santos, el 5 de abril de 2000. El 10 de abril de 2000, Santos solicitó al tribunal que dictara sentencia sumaria a su favor, emitiera una orden de Mandamus y declarara nula esta acción de Corrección. También solicitó que se discutiera esta petición durante la vista del 5 de mayo. No hizo reclamación alguna por concepto de daños. En la misma fecha, además, apeló la determinación de Corrección del 5 de abril mediante el procedimiento intemo de dicha agencia, acompañando copia de la solicitud de sentencia sumaria.
El 5 de mayo de 2000, el E.L.A. solicitó en corte abierta la desestimación de la demanda, alegando que tras la decisión del 5 de abril, el único remedio disponible a Santos era la apelación ante la Directora de Clasificación de Corrección, cuya determinación, a su vez, era final e inapelable. Santos se opuso, indicando que la decisión del 5 de abril debía anularse, por la negativa reiterada de Corrección a brindarle las garantías del debido proceso de ley. *811 El 10 de julio, el tribunal de instancia emitió la sentencia que nos ocupa, la cual fue notificada el 26 de julio de 2000, concediendo a Santos los remedios solicitados.
En su sentencia, el tribunal apelado encontró probado que Santos cumple una condena de 99 afios de reclusión desde el 25 de octubre de 1991, por infracción al artículo 83 del Código Penal, asesinato en primer grado e infracción a los artículos 6 y 8 de la Ley de Armas. Cumplirá el mínimo de su sentencia en 2016. Fue clasificado en custodia mediana el 21 de septiembre de 1994, clasificación que fue ratificada el 9 de marzo de 1999. Desde su ingreso a la institución penal, Santos se ha mantenido estudiando y trabajando, mostrando buenos hábitos de trabajo y conducta, cooperación y responsabilidad, sin que haya sido objeto de querellas administrativas por actos de indisciplina. Santos completó las terapias ofrecidas por el Negociado de Evaluación y Asesoramiento, así como de la Administración de Servicios de Salud Mental y Contra la Adicción (A.S.S.M.C. A.), a pesar de no ser adicto a drogas. El 16 de marzo de 1999, Santos solicitó evaluación de su clasificación correccional por la Administración de Corrección y su reclasificación a custodia mínima, solicitando que se le concedieran las garantías mínimas procesales establecidas en la L.P.A.U. El 13 de septiembre de 1999, Corrección ratificó nuevamente la clasificación de Santos en custodia mediana, negándole en el proceso las garantías solicitadas. Santos instó una demanda el 7 de marzo de 2000, solicitando que se ordenara a Corrección y a sus funcionarios que le reconocieran las garantías procesales contenidas en la Ley de Procedimiento Administrativo Uniforme durante el proceso de reclasificación de custodia, y celebraran el trámite de reclasificación de custodia, a tenor con los rigores de dicha Ley. El 5 de abril de 2000, el Comité de Clasificación y Tratamiento (en adelante, "el Comité") se negó nuevamente a considerar su reclasificación a custodia mínima, aduciendo poco tiempo en confinamiento y en custodia mediana. El 10 de abril de 2000, Santos apeló dicha determinación de Corrección por los mismos fundamentos especificados en la demanda.
A base de las determinaciones de hechos esbozadas, el tribunal a quo entendió que el caso presentaba dos controversias: primero, si Santos tenía un interés libertario o propietario en su proceso de reclasificación que mereciera la protección de las garantías del debido proceso de ley, y segundo, si el procedimiento de reclasificación de custodia le brindaba las garantías mínimas procesales dispuestas por la Ley de Procedimiento Administrativo Uniforme. A base de los principios establecidos en la disposición constitucional de rehabilitación de confinados y en la Ley Núm. 116 del 22 de julio de 1974, 4 L.P.R.A. 1101 y sigs., y la L.P.A.U., así como la jurisprudencia relativa a dichas normas, el tribunal de instancia determinó, primeramente, que las garantías del debido proceso de ley son de aplicación al procedimiento seguido en la reclasificación de confinados, ya que Corrección es una agencia administrativa sujeta a la L.P.A.U., por lo que viene obligada a brindar las garantías mínimas procesales establecidas en esta ley en sus procedimientos adjudicativos y a reglamentar dichos procesos. Concluyó que la aprobación del Reglamento de Procedimiento Uniforme en vistas Administrativas, Expediente Núm. 3818 (en adelante, "el Reglamento"), por Corrección, demostró la intención de salvaguardar las garantías mínimas procesales del debido proceso de ley en sus procesos adjudicativos.
Además, el tribunal sostuvo que al establecerse estatutariamente la clasificación de custodia se creó un interés libertario o propietario del confinado sobre su clasificación, si bien con ciertas limitaciones. Acto seguido, analizó la estructura del sistema de corrección y rehabilitación, al cabo de lo cual resolvió que el "Manual de Clasificación de Confinados" (en adelante, "el Manual"), Expediente Núm. 6067 aprobado el 23 de diciembre de 1999 y puesto en vigor el 22 de enero de 2000, establece un procedimiento adjudicativo para los procesos de reclasificación de los confinados, sujeto a la L.P.A.U., que el mismo se rige por el Reglamento y que dicho procedimiento fue activado por Corrección al iniciarse el trámite de reclasificación de custodia de Santos, trámite que el tribunal calificó como procedimiento de adjudicación formal.
Concluyó, además, que el procedimiento establecido en el Manual -y, en consecuencia, el que confrontó Santos-, no cumple los requisitos del debido proceso de ley, pues no permite al confinado confrontar la información sometida al Comité durante el proceso. Fundamentó dicha conclusión en que el procedimiento carece de disposiciones que permitan al confinado estar presente durante las reuniones del Comité de Clasificación y Tratamiento en las que se considere su clasificación, "y peor aún... permite al comité solicitar la comparecencia *812 de terceras personas de la institución que hayan intervenido con el confinado, y solicitar información de éstos, que será utilizada por el Comité para emitir su decisión sobre la reclasificación de la custodia del confinado." Sentencia del Tribunal de Primera Instancia, pág. 20. Tampoco concede al confinado el derecho a revisión judicial de la decisión tomada por la Directora de Clasificación de Corrección, funcionario administrativo a cargo de atender las apelaciones intemas de las determinaciones del Comité.
Asimismo, el foro de instancia determinó que las disposiciones de la L.P.A.U. y del Reglamento obligaban a Corrección a advertir al confinado que tenía derecho a asistir acompañado de abogado a la reunión del Comité de Clasificación; que aun cuando el confinado tiene derecho a que la determinación sobre el nivel de custodia se haga a base de la totalidad de su expediente, el Manual dispone que sólo se considerará la participación del confinado en programas formales que Corrección haya puesto a disposición de los confinados desde la última revisión de custodia y que queda a discreción del Comité considerar la conducta anterior del confinado; que el Manual sólo requiere que la resolución del Comité exponga los fundamentos de la decisión, en lugar de determinaciones de hechos y conclusiones de derecho, como requiere el ordenamiento para los procesos de adjudicación formal y que el procedimiento de apelación establecido en el Manual es inadecuado. El tribunal determinó, además, que el recurso de Mandamus era el remedio apropiado para ordenar al Comité que cumpla con sus deberes ministeriales.
En conclusión, el Tribunal de Primera Instancia resolvió que las inobservancias del debido proceso de ley viciaron el proceso seguido en este caso y que el Comité debía, en un plazo no mayor de diez días, celebrar nuevamente su reunión y realizar las gestiones conducentes a considerar la revisión de la clasificación de Santos, reconociendo a Santos los derechos establecidos en el Reglamento, a saber:
"notificación de la vista y/o reunión ante el Comité; término para prepararse; derecho a estar representado por abogado; vista; derecho a contrainterrogar y someter evidencia; emitir determinaciones de hechos y conclusiones de derecho que cumplan con el debido proceso de ley; orientarle de su derecho a solicitar reconsideración y revisión judicial; y ser notificado de la determinación tamada." (Citas omitidas) Sentencia del Tribunal de Primera Instancia, pág. 29.
Dicho procedimiento, según ordenó, se guiará por los propósitos de la Ley Núm. 116, supra, y de la política constitucional de rehabilitación, utilizando "el método de rehabilitación en la comunidad en la mayor dimensión posible mediante programas de trabajo, estudio o tratamiento, cuando ello sea compatible con la seguridad pública". Sentencia del Tribunal de Primera Instancia, pág. 31.
III
El E.L.A. sometió la presente apelación el 25 de agosto de 2000. Alegó que el tribunal de instancia erró al no brindarle la oportunidad de expresarse adecuadamente sobre el asunto, como parte promovida en una solicitud de sentencia sumaria. En apoyo de este único señalamiento de error, el Estado señala que el tribunal a quo no le requirió, ni le brindó la oportunidad de expresarse sobre la solicitud de sentencia sumaria y sus consecuencias, ni de controvertir las alegaciones de hecho del promovente; que la sentencia sumaria fue dictada exclusivamente a base de las alegaciones de Santos, sin prueba fehaciente de los elementos de la causa de acción -a tal punto que la demanda fue juramentada por una persona desconocida y ajena a la misma-, y a base del entendimiento de que la falta de oposición de parte del Estado equivalía a un consentimiento; que la sentencia sumaria dictada tenía visos de ser una sanción severa y que la facultad del tribunal para imponer sanciones no incluye la concesión de remedios improcedentes en derecho. Por último, adujo que la actuación del tribunal sentenciador lesionó un interés gubernamental importante.
El 6 de diciembre de 2000, Santos se opuso a la apelación. Indicó que su demanda había cumplido los requisitos de la solicitud de sentencia declaratoria, que el Estado no presentó oposición alguna a la solicitud de sentencia sumaria y que el tribunal no estaba obligado a ordenarle que lo hiciera. Expuso, además, que el Estado tuvo amplia oportunidad de presentar prueba de la conducta de Santos y que no descargó su obligación de *813 presentar, antes de la vista del 5 de mayo de 2000, la prueba que tuviera contra la solicitud de sentencia sumaria, por lo cual había perdido la oportunidad de hacerlo y que la sentencia sumaria dictada no podía considerarse como una sanción. Además, solicitó a este Tribunal que tuviera por no puestas tanto la alegación de lesión de interés importante del Estado, como la de falta de conocimiento personal de la persona que juramentó la demanda, ambas por falta de discusión de sus fundamentos en el escrito apelativo y la segunda, además, por no haberse argumentado en instancia.
De esta forma, las controversias en este caso se limitan a determinar si el tribunal de instancia podía, en las circunstancias explicadas, dictar sentencia sin apercibir expresamente a Corrección que debía someter su oposición a la solicitud de sentencia sumaria y si el tribunal erró como cuestión de derecho al determinar que Corrección venía obligada a brindar al confinado las garantías del debido proceso de ley estatuidas en la Ley de Procedimiento Administrativo Uniforme al revisar su clasificación de custodia.
El Estado argumenta que el tribunal de instancia no le brindó oportunidad de oponerse a la solicitud de sentencia sumaria presentada por Santos. Además, alega que este caso envuelve alegaciones de hechos sobre un trámite administrativo intemo de Corrección, que el promovente no presentó documentos estableciendo la posición de Corrección, ni la ausencia de controversia en cuanto la los términos de la sentencia que cumple el apelado; los acuerdos y criterios tomados en consideración por el Comité de Clasificación y Tratamiento para fijar a éste un nivel de custodia mediana; y la metodología utilizada para llegar a tal conclusión. En consecuencia, según el Estado, el tribunal de instancia nunca estuvo en posición de adjudicar las controversias suscitadas en la demanda. Además, argumenta que el tribunal apelado no le concedió oportunidad alguna para replicar a la solicitud de sentencia sumaria, por lo que su concesión file un abuso de discreción. Según alega, "[ e ]n el presente caso... no consta documento alguno fijando la posición de la apelante con respecto al reclamo que se hace en su contra..., [ni] tan siquiera la contestación a la demanda. El foro sentenciador ha actuado únicamente a base de las alegaciones expuestas por el apelado en cuanto a los hechos del caso." Fundamentó su posición, además, en su percepción de que la vista celebrada el 5 de mayo de 2000 se ceñía al estado de los procedimientos en el caso y no los méritos del mismo.
El error alegado no se cometió. No hay duda de que un tribunal puede dictar sentencia sumariamente y disponer de un caso, sin celebrar vista en su fondo, si el promovente demuestra que no hay controversia en cuanto a los hechos esenciales alegados en la demanda y que tan sólo resta disponer de las controversias de derecho existentes. Regla 36 de las de Procedimiento Civil, 32 L.P.R.A. Ap. Ill, R. 36; PFZ Properties, Inc. v. General Accident Insurance Company, 136 D.P.R. 881, 911 (1994); Medina Morales v. Merck, Sharp & Dohme, 94 J.T.S. 52, Opinión de 7 de abril de 1994. No obstante, a pesar de que promueve la economía procesal, el objetivo de la sentencia sumaria, como el de toda acción judicial, es proveer una solución justa a la controversia entre las partes. Cuadrado Lugo v. Santiago Rodríguez, 126 D.P.R. 272, 279 (1990). Es por ello que, antes de disponer de un caso sumariamente, el tribunal debe determinar que no existe controversia en cuanto a los hechos y, en segundo lugar, que en derecho procede emitir sentencia a favor de la parte que la solicita. M.J.C.A., Menor v. Menor, 124 D.P.R. 910, 930 (1989).
En vista de que la sentencia sumaria adjudica el litigio sin que las partes tengan la oportunidad de presentar su caso en corte, la jurisprudencia la concibe como un "remedio extraordinario que sólo debe concederse cuando el promovente ha establecido su derecho con claridad y ha demostrado que la otra parte no tiene derecho a recobrar bajo cualquier circunstancia que resulte discernible de las alegaciones que no hayan sido refutadas por la evidencia presentada con la moción". Corp. of Presiding Bishop v. Purcell, 117 D.P.R. 714, 720 (1987). Sólo se puede dictar sentencia sumaria cuando no existe una legítima disputa de hechos a ser dirimida y sólo resta aplicar el derecho y cuando no se ponen en peligro o se lesionan los intereses de las partes. Pardo Santos v. Stella Royo, 98 J.T.S. 80 (Res. el 17 de junio de 1998). Los hechos aportados por la parte contra la cual se solicita la sentencia sumaria deben ser tomados por ciertos. Roth v. Lugo, 87 D.P.R. 386, 398 (1963). Por eso, la duda por parte del tribunal sobre la existencia de una controversia de hechos en el caso ante su consideración derrota la moción de sentencia sumaria. Más aún, según nuestro ordenamiento, toda duda en *814 cuanto a si un hecho fue controvertido debe resolverse a favor de la parte que se opone a la moción.
El trámite de la solicitud de sentencia sumaria se rige por unos términos específicos. Una parte que trate de obtener un remedio mediante demanda o sentencia declaratoria puede solicitar que se dicte sentencia sumariamente a su favor sobre la reclamación después de haber transcurrido veinte (20) días a partir de la fecha en que se emplace al demandado. Regla 36.1 de Procedimiento Civil, 32 L.P.R.A. Ap. IH, R. 36. Además, ”[l]a moción se notificará a la parte contraria con no menos de diez (10) días de anticipación a la fecha señalada para la vista. Con anterioridad al día de la vista, la parte contraria podrá notificar contradeclaraciones juradas." Regla 36.3 de Procedimiento Civil, supra. "La parte opositora, para derrotar la solicitud de sentencia sumaria, debe presentar, como regla general, contradeclaraciones juradas y contradocumentos que pongan en controversia los hechos presentados por el promovente." Tello v. Eastern Airlines, Inc., 119 D.P.R. 83 (1987).
En el caso de autos, la solicitud de sentencia sumaria fue presentada en tiempo, es decir, al menos veinte días después del emplazamiento y diez días antes de la vista. La vista del 5 de mayo de 2000, no se ceñía a la discusión del estado de los procedimientos del caso. Por el contrario, se citó para evaluar el cumplimiento de una estipulación -cuyo contenido no es mencionado por el Estado en su recurso-, y el tribunal ordenó la comparecencia a la misma de la Oficial Sociopenal para presentar el informe de ajuste de Santos. Además, Santos solicitó que se discutiera su petición de sentencia sumaria durante la vista y no consta en autos que el Estado se opusiera a dicha petición. Estos elementos constituyen advertencia suficiente del verdadero ámbito de la vista. Como promovido en una solicitud de sentencia sumaria, nada impedía que el Estado presentara contradeclaraciones juradas o la prueba que pusiera en controversia los hechos alegados por el promovente. Al no hacerlo y limitarse a presentar un argumento de derecho en dicha vista, el Estado sometió la controversia de hechos al tribunal de instancia a base de los documentos obrantes en los autos, incluyendo los sometidos con la solicitud de Santos. Evidentemente, el Estado tuvo plena oportunidad de oponerse a la sentencia sumaria solicitada. No hacerlo constituyó una omisión de su parte no atribuible al tribunal. Por otra parte, no encontramos fundamento para concluir que la disposición sumaria del caso se hizo como sanción al Estado. El único énfasis que hace el juez de instancia en la ausencia de oposición a la solicitud de sentencia sumaria va dirigida a señalar que con ello, no se controvirtieron los hechos alegados por el demandante y sostenidos por los documentos presentados en apoyo de su solicitud. El Estado tampoco fundamentó su escueta alegación de lesión "a un importante interés gubernamental". El Tribunal Supremo de Puerto Rico ha resuelto que "la sola alegación de error, que luego no se fundamenta o discute, no debe ser motivo para revisar, modificar o de alguna manera cambiar una decisión de un tribunal de instancia". Quiñones López v. Manzano Pozas, 141 D. P.R. 139, 165 (1996); J.R.T. v. Hato Rey Psychiatric Hosp., 119 D.P.R. 62 (1987).
Nada impide, por otra parte, que se expida el auto de mandamus sumariamente. El propósito del auto de mandamus és requerir el cumplimiento de algún acto que está dentro de las atribuciones o deberes ministeriales de la persona contra quien se entabla el recurso. Art. 649 del Código de Enjuiciamiento Civil, 32 L.P.R.A. see. 3421. Por su naturaleza, como recurso extraordinario, no podrá dictarse en aquellos casos en los que el curso ordinario de la ley provee un recurso adecuado y eficaz. Art. 651 de dicho Código, 32 L.P.R.A. see. 3423. Sin embargo, antes de determinar si el recurso de mandamus es el remedio adecuado para lo que pretende un demandante, los tribunales apelativos deben considerar si iniciar otra acción resultaría en una duplicidad de procedimientos innecesaria que daría al traste con el principio de economía procesal. Además, una petición de mandamus puede considerarse y resolverse como un recurso de sentencia declaratoria. Lebrón Velázquez v. Romero Barceló, 101 D.P.R. 915, 921 (1974). En todo caso, el mandamus sólo procede cuando el derecho del peticionario es claro. Espina v. Calderón, 75 D.P.R. 76, 84 (1953). Al respecto, la Regla 55 de Procedimiento Civil, 32 L.P.R.A. Ap. III, dispone lo siguiente, en lo pertinente:
"Cuando se solicitare dicho remedio [mandamus] y el derecho a exigir la inmediata ejecución de un acto sea evidente y aparezca que no se podrá dar ninguna excusa para no ejecutarlo, el tribunal podrá ordenar perentoriamente la concesión del remedio; de otro modo, ordenar que se presente una contestación y tan *815 pronto sea conveniente, celebrará una vista, recibiendo prueba, si fuere necesario,, y dictará su. decisión prontamente." (Corchetes nuestros)
David Rivé Rivera, en su obra Recursos Extraordinarios, Univ. Interamencana de Puerto Rico, 2da. Bd., 1996, págs. 127-129, discute el carácter extraordinario del recurso y su impacto sobre, distintas características y requisitos de los procedimientos ordinarios. Concluye, entre otras cosas:
"...que la interpretación correcta del procedimiento estatuido ppr la Regla 55prescinde, dé la necesidad de un emplazamiento ordinario. En su lugar, el. demandado debería ser traído al pleito mediante ana orden para que comparezca dentro del término que fija el tribunal y presente sus alegaciones. El tribunal siempre tiene, el poder para acortar los términos dentro de los cuales tiene que comparecer el demandado, [Citando a úrtalaza García v. Fondo del Seguro del Estado, 116 D.P.R. 700, 703 (1985)].
Los procedimientos ulteriores están regulados por una lacónica expresión en la: Regla 55 qw ordena la celebración de una vista 'tan pronto sea conveniente' en la cual se recibirá prueba %i fmre-meC$&rioX Sáfe precisa la regla que el juzgador dictará su decisión 'prontamente'. No dice nada sobrela-aplicqkilidad de otras: reglas, en particular las relativas a las alegaciones y la de los mecanismos de descubrimiento de prueba. La Regla 61 de Procedimiento Civil deja este problema abierto a la interpretación jurisprudencial al señalar que-: 'todos [los procedimientos legales especiales,] los recursos extraordinarias, y cualesquiera otras procedimientos de naturaleza especia], no incluidos en las Reglas 55, 56, 57, 58, 59 y 60, se tramitarán en la forma prescrita en el estatuto correspondiente. En todo aquello que no resulte incompatible, nj esté en¡ conflicto con [las disposiciones de dichos estatutos, se aplicarán] las disposiciones de estas reglas‘
Cabe señalar que algunas de las lagunas han sido cubiertas por la jurisprudencia. Específicamente, en, cuanto al contenido de las alegaciones, se exige como requisito que el peticionario precise en, detalle el ario que le requiere, al demandado, y el requerimiento previo que se le ha hecho. [Carro v. Matos, 67 D.P.R. 465 (1947); Piuguez v. Junta de Retiro, 50 D.P.R. 693 (1936) y otros] [...].
No se ha pronunciado el Tribunal Supremo en cuanto a la posibilidad de descubrimiento de prueba en, un procedimiento de mandamus. No hay nada que lo impida, siempre y cuando el uso de estos procedimientos no, 'desvirtúe la naturaleza sumaria del recurso'." (Corchetes nuestros)
El remedio de sentencia declaratoria, que también fue solicitado por Santos, se rige por la Regla 59.2 de Procedimiento Civil, 32 L.P.R.A. Ap. III, según la cual: "Toda persona... cuyos derechos, estado u otras relaciones jurídicas fuesen afectados por un estatuto..., podrá solicitar una decisión sobre cualquier divergencia en la interpretación o validez de dichos estatutos... y además que se dicte una declaración de los derechos, estados u otras relaciones jurídicas que de aquéllos se deriven." Además, la Regla 59.1 dispone que "[n]o se estimará motivo suficiente para atacar un procedimiento o acción el que se solicite una resolución o sentencia declaratoria", y que "el tribunal podrá ordenar una vista rápida de un pleito de sentencia declaratoria, dándole preferencia en el calendario".
Veamos si la demanda de epígrafe cumple los requisitos establecidos para los remedios solicitados.
IV
Para establecer su derecho a una sentencia dictada sumariamente, el demandante alegó que no existían controversias de hechos y que como cuestión de derecho procedía dictar sentencia a su favor. Expuso que la evaluación realizada por el Comité de Clasificación utilizó un instrumento que daba un énfasis excesivo a la gravedad de los delitos por los cuales fue convicto y solicitó expresamente que su petición fuera dilucidada @0 la vista que el tribunal ya había señalado para el 5 de mayo de 2000, para verificar el cumplimiento de cierta estipulación. Acompañó su petición con copias de veinticinco certificados que evidenciaban SU continua participación en actividades educativas, recreativas y rehabilitativas durante los últimos cinco años y nueve meses de un período de reclusión de ocho años y cuatro meses, así como de los acuerdos del Comité y ''el *816 Instrumento de Reclasificación de Custodia" utilizado en su caso.
Este "instrumento" es el "Formulario de Evaluación de Clasificación" incluido como Apéndice G-2 en el Manual de Clasificación del 23 de enero de 2000, junto con sus instrucciones. En su sección 2, inciso III.C.6, el Manual dispone que este formulario lo llenará un/a técnico/a de clasificación. Según explica la sección II de las instrucciones, el formulario establece criterios tanto objetivos como subjetivos para evaluar la clasificación de un confinado. Los factores objetivos se detallan en el inciso 1 de la sección II del formulario; entre ellos se incluye la severidad del delito más grave por el cual fue convicto el confinado. A este factor de severidad del delito se le asigna una puntuación que se sumará a las de los demás factores objetivos para determinar un nivel inicial de custodia que luego podrá ser modificado por ciertas consideraciones mandatorias o discrecionales que el Manual establece. La combinación de puntuación objetiva y estas consideraciones adicionales resultan en el nivel de custodia al que debe asignarse el confinado. Este nivel puede ser más alto o más bajo que el nivel inicial obtenido mediante la aplicación de los criterios objetivos. Para propósitos de la referida escala, el Anejo 1 del Apéndice G-2, titulado "escala de gravedad del delito" dispone que a los asesinatos en primer grado se les considera de gravedad extrema, por lo que en el formulario se le asigna la puntuación más alta, de 6 puntos.
El Manual permite aplicar discrecionalmente ciertos factores, para colocar al confinado en un nivel de custodia más alto. Inciso D de la sección II de ías instrucciones del Apéndice G-2 del Manual. En este sentido, el criterio de "gravedad del delito" se debe utilizar cuando "la puntuación [de la escala objetiva] subestima la gravedad del delito". En ese caso: "El personal debe documentar las características del delito que están registradas en la declaración de los hechos que se utiliza para la decisión sobre las modificaciones". Bajo "otros", el Manual dispone que el técnico o la técnica podrá tomar en consideración "cualquier otro atributo relacionado con el confinado que justifique una modificación a un nivel de custodia más alto". Ahora bien: "Se debe incluir en el expediente del confinado o en otros registros de la AC documentación completa de este (estos) factor(es). ’’Bajo el inciso III.F, las instrucciones del formulario requieren que se "[ejxplique cuál de las modificaciones discrecionales para niveles de custodia más altos o más bajos se aplican al confinado e incluya los detalles correspondientes."
El instrumento de evaluación, una vez completado por el técnico o la técnica de clasificación y avalado por su supervisor o supervisora, debe ser notificado al confinado y la recomendación resultante debe ser revisada por el Comité de Clasificación y Tratamiento, según indica el inciso B de la sección IV del Manual. Para ello, el Técnico Sociopenal, asignado al confinado, debe someter al Comité un informe "sobre los puntos que serán evaluados y el comportamiento del confinado en los diferentes aspectos de la vida institucional", según reza el Inciso V.B.2 de la sección 2 del Manual.
El Comité de Clasificación y Tratamiento de cada institución está compuesto del supervisor de la unidad sociopenal o el técnico de servicios sociopenales de mayor rango, un técnico sociopenal y un consejero correccional u oficial correccional, además de un representante institucional de Salud Correccional, si la decisión sobre la reclasificación del confinado incluye un asunto relacionado con la salud. Inciso IV.B de la sección 2 del Manual. El deber primordial de dicho comité es evaluar a los confinados en lo que respecta a sus necesidades, intereses, limitaciones, y funcionamiento social, garantizando los objetivos de rehabilitación y seguridad pública, según disponen los incisos IV y IV.A de dicha sección. El comité se debe reunir semanalmente y debe mantener un acta de todas las reuniones, incluyendo información específica de cada caso revisado y sus determinaciones. El Programa de Revisión de Custodia del Comité de Clasificación, creado por el inciso V.D de la referida sección, dispone que “el Comité revisará anualmente los niveles de custodia para los confinados de custodia mínima y mediana”, mientras que los de "custodia máxima serán revisados cada seis (6) meses, después de un (1) año de clasificación como confinado de custodia máxima".
En el inciso V de la sección 2, el Manual establece el procedimiento que el Comité de Reclasificación y Tratamiento debe seguir en la toma de decisiones. El Comité debe analizar toda la información puesta a su disposición, solicitar la comparecencia del confinado y discutir con él la decisión y recomendaciones del *817 Comité, luego de lo cual el confinado debe recibir copia de la decisión del Comité y sus fundamentos, junto con una copia del formulario de apelación de clasificación. El Director o su representante deben documentar la decisión formal y recomendaciones del Comité "junto con la fecha de la reunión".. Además,, elcomité puede solicitar la comparecencia e información de otras personas de la institución que hayan intervenido con el confinado.
Los certificados cuya copia incluyó Santos con su solicitud de sentencia sumaria tienden a demostrar una actividad rehabilitativa constante, que debió tomarse en consideración en la evaluación que llevó a cabo el Comité. El Instrumento de Reclasificación de Custodia, a su vez, evidencia que la recomendación hecha al Comité por la Técnica de Clasificación se fundamentó en el ejercicio de su facultad discrecional para considerar circunstancias excepcionales, tales como la gravedad del delito y el poco tiempo que Santos había cumplido en custodia mediana. Este periodo fue calculado cómo 5 años y 5 meses en el encasillado de "otra" excepción discrecional y el tiempo total de confinamiento fue calculado como 8 años, 5 meses y 2 días en el apartado dedicado a la explicación de la modificación discrecional, indicando que ”[e]l mínimo cumple 2016". En dicho encasillado no se incluyó explicación alguna para la consideración de la gravedad del delito. Esta ya se había considerado en la sección destinada a los criterios 2 de evaluación de custodia, medíante los cuales Santos obtuvo una puntuación de 4 en la escala evaluativa, lo que equivalía a un nivel de custodia mínima, a pesar de haber recibido la puntuación máxima atribuible a la gravedad del delito cometido. Los acuerdos del Comité, copia de los cuales también fue anejada, evidencian que los fundamentos de los acuerdos tomados fueron la severidad de los delitos cometidos y el poco tiempo cumplido en relación con la sentencia, "[sjegún el nuevo manual de clasificación".
La prueba ofrecida por Santos, pues, establece claramente que en el proceso de considerarse su solicitud de reclasificación, se incumplió con las disposiciones reglamentarias discutidas. Esto evidencia su derecho a solicitar que se corrigiera la evaluación y, al no tener éxito en sus reclamos, a solicitar el auto de mandamus. En primer lugar, en la recomendación que la Técnica de Clasificación envió al Comité y que fue adoptada.por éste, se utilizó el criterio discrecional de gravedad del delito, sin explicar los fundamentos para -concluir que había una desproporción entre la puntuación asignada a los delitos cometidos por Santos (la máxima permitida) y la severidad de los mismos, que ameritara aplicar este criterio discrecional. En segundo lugar, el instrumento de evaluación no explica los factores tomados en consideración de manera adecuada para justificar un nivel de custodia más alto al que resulta de la aplicación de los criterios objetivos. Esta justificación tendría que fundamentarse en la política institucional de rehabilitación y seguridad pública. Por último, las minutas de la consideración del caso por el Comité no tuvieron el efecto de corregir los errores señalados. Lo anterior constituye prueba del derecho que tiene Santos a que la decisión del Comité de Clasificación sea corregida, así como de la obligación que tienenlos demandados de realizar dichas correcciones y cumple los requisitos establecidos para la solicitud de Mandamus. 
V
En la vista celebrada el 5 de mayo de 2000, el demandado solicitó que la demanda fuera desestimada, alegando que una vez emitida la determinación del Comité de Reclasificación, lo procedente era someter una apelación intema ante Corrección. Santos se opuso, aduciendo que la decisión del Comité debía anularse, por la violación reiterada a su derecho a un debido proceso de ley. La Ley de Procedimiento Administrativo Uniforme (L.P.A.U.) faculta a los tribunales para relevar a una parte de la obligación de agotar los remedios administrativos. Ley Núm. 170 del 12 de agosto de 1988, 3 L.P.R.A. 2101 y sigs see. 4,3, 3 L.P.R.A. 2173, El tribunal puede ejercer dicha discreción, entre otros casos, cuando los remedios administrativos sean inadecuados o cuando haya una violación sustancial de derechos constitucionales, para lo cual es necesario que el reclamante demuestre la existencia de un agravio de patente intensidad que lo justifique. Mercado Vega v. U. P.R., 128 D.P.R. 273, 286 (1991).
En el caso que nos ocupa, el tribunal de instancia analizó las alegaciones, los reglamentos aplicables y las controversias y llegó a la conclusión de que en el proceso hubo violaciones a los derechos constitucionales de *818 Santos, por lo que procedían los remedios solicitados por éste, a pesar del planteamiento de falta de agotamiento de remedios administrativos hecho por el Estado. Resolvemos que dicha apreciación es correcta.
El tribunal apelado apoyó su determinación en Hewitt v. Helms, 459 U.S. 460, 471-472 (1983), en el que un confinado impugnaba la determinación de segregado de la población penal. El Tribunal Supremo de los Estados Unidos resolvió que la utilización de un lenguaje "inequívocamente mandatorio" en la redacción de las normas que rigen el procedimiento de toma de decisiones por los oficiales correccionales, crea un interés libertario protegido por la enmienda Décimocuarta de la Constitución norteamericana, aunque también reconoce que "los administradores de prisiones deben recibir gran deferencia en la adopción y ejecución de políticas y prácticas para preservar el orden interno y la disciplina y para mantener la seguridad institucional". Hewitt v. Helms, supra, a la pág. 472. (Traducción nuestra).
Años después, el Tribunal determinó que el criterio utilizado en Hewitt v. Helms, supra, desalentaba la adopción de normas por parte de las autoridades carcelarias y concluyó que el factor determinante no debía ser el texto de los estatutos y reglamentos, sino la naturaleza de la privación que sufre el confinado. Sandín v. Conner, 115 S.Ct. 2293, 2297 (1995). Acorde a este nuevo criterio, la protección del debido proceso de ley sólo se extiende al derecho a estar "libre de restricciones significativa y atípicamente onerosas al confinado en cuanto a los incidentes ordinarios de la vida en prisión." Id., a la pág. 2294. Posteriormente, al revisar un procedimiento disciplinario contra un confinado a quien se le privó de créditos por buena conducta, el Tribunal Supremo de los Estados Unidos determinó que el Estado venía obligado a permitirle presentar testigos a su favor, como parte de las garantías del debido proceso de ley. Indicó el Tribunal que cuando la determinación de las autoridades carcelarias se impugna por la ausencia de garantías del debido proceso de ley y no por la insuficiencia de la prueba, el que el expediente contenga prueba suficiente para apoyar la conclusión de la institución resulta irrelevante. Edwards v. Balisok, 117 S.Ct. 1584, 1588 (1997). Este es, precisamente, el fundamento de la impugnación que trajo Santos ante la consideración del tribunal de instancia en el caso que nos ocupa.
Establecido el alcance del debido proceso de ley en los procedimientos adjudicativos carcelarios según la Constitución norteamericana, debemos examinar la naturaleza del interés de Santos en su clasificación según el Derecho puertorriqueño. Para ello es menescer recordar que la Constitución de Puerto Rico, a diferencia de la norteamericana, establece una política pública de rehabilitación. El artículo VI, sección 19 de la Constitución de Puerto Rico, en su parte pertinente, dispone que: "Será política pública del Estado Libre Asociado... reglamentar las instituciones penales para que sirvan a sus propósitos en forma efectiva, y propender, dentro de los recursos disponibles, al tratamiento adecuado de los delincuentes para hacer posible su rehabilitación moral y social."
Esta cláusula fue propuesta por la Comisión de Disposiciones Transitorias y Asuntos Generales, eliminada y restituida en su estado actual, por unanimidad, ante los argumentos presentados por el Delegado José Veray, Jr., de Aguadilla, quien abogó por la necesidad de elevar el principio de rehabilitación a nivel constitucional. 3 Diario de Sesiones de la Asamblea Constituyente 2038, 2133 y 2145, Ed. 1961. En esencia, Veray indicó que la sociedad debía sustituir la teoría de la pena como un elemento de vindicación por:
"La tendencia moderna... de hacer las cárceles, las instituciones penales, sitios de rehabilitación del delincuente; es decir, sitios donde no se manda ahí una cosa despreciable, a un canalla, a un estorbo, no; sitios en donde la sociedad, reconociendo la responsabilidad que tiene hacia esos delincuentes, los envía para ser tratados -he ahí la palabra tratamiento- para ser tratados como se envía un enfermo, un loco, por ejemplo, a un manicomio, después de haber matado a dos o tres personas, para ser tratado también, no sencillamente para vivir allí como un ser enteramente despreciable. Esa teoría, señor Presidente y señores delegados, se conoce en la ciencia penal con el nombre de la individualización de la pena...". 3 Diario de Sesiones de la Asamblea Constituyente 2143. (Enfasis nuestro).
*819 Al terminar sus discusiones, la Comisión de Disposiciones Transitorias y Asuntos Generales presentó a la Convención Constituyente un informe que incluyó el texto final de la disposición que nos ocupa, consignando que la misma "es directriz de carácter general. Debe ser supeditada a los recursos económicos del gobierno." 4. Diario de Sesiones de la Asamblea Constituyente 2624, Ed. 1961. La Comisión de Estilo le dio la forma que tiene hoy en día, agrupándola con otras recomendaciones de la Comisión de Asuntos Generales. Trías Monge, Historia Constitucional de Puerto Rico, Vol. Ill, Ed. U.P.R., 1982, pág. 235.
Este historial describe claramente el contorno del derecho a la rehabilitación que protege- a Santos: la sociedad puertorriqueña tiene un compromiso con el principio de rehabilitación e individualización de la pena, de cuyo cumplimiento el Estado asume la responsabilidad, tanto ante la comunidad como ante los reclusos, responsabilidad que sólo puede ser supeditada a la falta de recursos económicos. Esto conlleva el reconocimiento de que el confinado tiene un interés, libertario en su proceso de rehabilitación. Toda acción tomada por el Estado que afecte dicho interés debe garantizar al confinado un debido proceso de ley, según dispone la jurisprudencia federal vigente. Resolvemos que el confinado tiene un interés libertario o propietario sobre su proceso de rehabilitación, de acuerdo a las normas establecidas en los reglamentos y la política constitucional de rehabilitación, mientras siga las pautas establecidas por dicho proceso. Ello es así, toda vez que al entrar al sistema correccional, se convierte en un cliente de dicho sistema que le ha privado de la libertad con el propósito expreso de buscar su rehabilitación.
VI
En vista de los hechos de este caso, sobre los cuales no hay controversia, concurrimos con el tribunal de instancia en que, al revisar la clasificación de custodia impugnada por Santos, no se le brindaron las garantías del debido proceso de ley. El contenido específico de estas garantías debemos encontrarlo en la naturaleza del procedimiento de clasificación.
El Tribunal Supremo de Puerto Rico ha aclarado que, luego de su adopción, la Ley de Procedimiento Administrativo Uniforme prevalece sobre todo reglamento o disposición legal adoptado por una agencia que resulte inconsistente con las disposiciones de dicha ley. Véanse, e.g., Cambarín et al v. A.R.P.E., 132 D.P.R. 938, 952-953 (1993); Pagán Ramos v. F.S.E., 129 D.P.R. 888, 902 (1992); Hernández v. Golden Tower Development Corp., 125 D.P.R. 744, 748 (1990). La Administración de Corrección no aparece exenta de la aplicación de esta ley, por lo que debe entenderse que también está gobernada por sus disposiciones. 3 L.P.R.A. see. 2103; compárese, Ortiz v. Alcaide Penitenciaría Estatal, 131 D.P.R. 849, 863 (1992), en cuanto a la aplicación de la L.P.A.U. a los procedimientos ante la Junta de Libertad Bajo Palabra.
Por otra parte, es principio arraigado en nuestra jurisdicción que una agencia viene obligada a observar estrictamente sus propios reglamentos, no pudiendo quedar a su arbitrio si reconoce o no los derechos que de ellos puedan dimanar. Torres Arzola v. Policía de Puerto Rico, 117 D.P.R. 204, 212 (1986); García v. Administración del Derecho al Trabajo, 108 D.P.R. 53, 56 (1978). Los reglamentos que guían la acción en el caso de autos son los sancionados por el artículo 5 de la Ley Núm. 116 del 22 de julio de 1974, 4 L.P.R.A. see. 1112, el cual dispone, en lo pertinente, lo siguiente:

"A los efectos de cumplir con sus objetivos, la Administración tendrá las siguientes funciones y facultades:

(a) Estructurar la política publica en el área de corrección.

(b) Organizar los servicios de corrección al propósito de que la rehabilitación tenga la más alta prioridad entre los objetivos del Gobierno del Estado Libre Asociado. A ese fin:

(1) Diseñar un nuevo sistema diversificado de instituciones, programas y recursos humanos que viabilice implantar un mejor tratamiento individualizado;

*820 (2) - (3).
(4) incorporar en el proceso rehabilitativo amplias oportunidades para adquirir destrezas, adiestramientos y conocimientos que faciliten al cliente el retomar a la comunidad debidamente equipado para asegurar una substancia [sic] decorosa, y
(5).

(c) Formular, conforme a los propósitos de este capítulo, la reglamentación interna necesaria para los programas de diagnóstico, clasificación, tratamiento y rehabilitación de la clientela del sistema correccional.

(d)-(q).”.
La reglamentación aprobada en virtud del inciso (c) transcrito, en su introducción, alude a la política constitucional de propender a la rehabilitación. Especifica que "[e]l método de clasificación de confinados es la médula de una administración eficiente y un sistema correccional eficaz". La política expresa de la misma es que "[tjodos los confinados bajo la jurisdicción de la AC [Corrección] serán clasificados de acuerdo con el nivel de custodia restrictiva más bajo que se requiera". Estas expresiones claramente denotan la intención de las normas vigentes de establecer criterios mandatories, y éstos, a su vez, crean un interés libertario en la evaluación de la clasificación del confinado que está protegido por el debido proceso de ley.
La clasificación de confinados en Puerto Rico representa las oportunidades que tienen los confinados para su reingreso a la sociedad, que es la meta final del proceso de rehabilitación. La Introducción del Manual define la clasificación como "la separación sistemática y evolutiva de los confinados en subgrupos, en virtud de las necesidades de cada cual, y las exigencias y necesidades de la sociedad." Además, dispone que "el proceso tiene que ubicar a cada confinado al programa y al nivel de custodia menos restrictivo posible para el que cualifique, sin menoscabar la seguridad y las necesidades de la sociedad, de los demás confinados, y del personal correccional." El efecto del proceso es "brinda[rj ayuda a los confinados en su readaptación y posible reintegración al sector mayoritario de la sociedad." En conclusión, establece que "[l]a meta del sistema1 correccional es clasificar objetivamente a todos los confinados y asignar recursos suficientes para que todos los confinados puedan ser miembros productivos de la sociedad y acatar sus leyes." En vista de estos principios, la clasificación de custodia es uno de los mecanismos de que dispone Corrección para canalizar su deber ministerial de brindar al confinado la oportunidad de rehabilitarse y reintegrarse a la libre comunidad.
Reconocemos que, desde el punto de vista constitucional, el Estado no viene obligado a adoptar un esquema específico de clasificación. Véanse, Sandín v. Conner, supra, a la pág. 482 (1995); Hewitt v. Helms, supra, a la pág. 471 (1983); Greenholtz v. Nebraska Penal Inmates, 442 U.S. 1, 7-8 (1979); Meachum v. Fano, supra, a las págs. 228-229 (1976). Pero, habiendo adoptado la Administración -al menos desde 1979-, reglamentos que establecen y definen varias categorías de custodia a base de criterios específicos, dicha actuación tiene la consecuencia de limitar el ejercicio de discreción por parte de la agencia, quien viene obligada a justificar sus determinaciones en esta área con arreglo a las normas por ella adoptadas. Ky. Dept. of Corrections v. Thompson, 490 U.S. 454, 462 (1989); Olim v. Wakinekona, 461 U.S. 238, 249 (1983); Vitek v. Jones, 445 U.S. 480, 488-491 (1980); Wolff v. McDonnell, supra, a las págs. 564-565.
Las determinaciones de la agencia al aplicar sus reglamentos, aunque merecen la deferencia de los tribunales, no pueden ser pro forma, sino que deben reflejar el razonamiento del foro administrativo y los fundamentos considerados por éste para arribar a su decisión. Associated Insurance Agencies, Inc. v. Comisionado de Seguros de P.R., 144 D.P.R._ 1997), 97 J.T.S. 142. Cabe señalar que la ausencia de estos fundamentos imposibilita la revisión, tanto judicial como administrativa, de dicha determinación. Esto hace que el remedio dispuesto por el Manual -la apelación ante la Directora de Clasificación de la Administración de Corrección, sección 4, inciso V-, sea inadecuado, circunstancia que, según vimos, activa una de las excepciones *821 a la doctrina de agotamiento de remedios administrativos.
Dada la naturaleza recurrente de este problema, en ejercicio de la facultad que le confiere la sección 4.6 de la Ley de Procedimiento Administrativo Uniforme, 3 L.P.R.A. see. 2176, para emitir órdenes de naturaleza remedial en apoyo de su función revisora, este Tribunal considera apropiado requerir al Administrador de Corrección, como lo hicimos recientemente en los casos KLRA-00-00736, RLRA-00-00871, KLRA-01-00054, KLRA-01-00097 y KLRA-01-00281, resueltos conjuntamente el 29 de septiembre de 2000, que emite directrices para asegurar que al tomar decisiones sobre clasificación y custodia, los funcionarios de esa agencia hagan determinaciones de hechos y expresen las razones o fundamentos que justifican su decisión, tal como lo ordenó a los funcionarios demandados el tribunal apelado en este caso.
Por los fundamentos expresados, se confirma la sentencia apelada y se ordena al Administrador de Corrección que emita directrices para asegurar que al hacer decisiones sobre clasificación y custodia, los funcionarios de esa agencia vengan obligados a hacer determinaciones de hechos y a expresar las razones o fundamentos que justifican su decisión.
Lo acordó y manda el Tribunal y lo certifica la Secretaria General.
Aida Ileana Oquendo Graulau
Secretaria General
ESCOLIOS 2002 DTA 33
1. Ante la ausencia de jurisprudencia puertorriqueña que establezca dicho interés, el tribunal analizó la jurisprudencia federal. Véanse Wolff v. McDonnell, 94 S.Ct. 2963 (1974), Meachum v. Fano, 49 L.Ed. 451 (1976) y Hewitt v. Helms, 459 U.S. 460 (1983).
2. En este sentido, la solicitud de mandamus no puede dirigirse contra los codemandados Estado Libre Asociado de Puerto Rico, Administración de Corrección, ni al Administrador de Corrección en su carácter de funcionarios públicos, sino contra este último en su carácter personal. Gladys Rivera, Ana Escobar, Juana Calderón y Doris Lebrón. Negrón v. Superintendente de Elecciones, 11 D.P.R. 366, 370 (1906).
3. Aunque no es esencial para la resolución del recurso, la prueba ofrecida también cumple los requisitos tanto de la sentencia declaratoria como de la sentencia sumaria. La solicitud de sentencia declaratoria planteó los derechos que amparaban a Santos bajo la Constitución del Estado Libre Asociado de Puerto Rico, la Ley de Procedimiento Administrativo Uniforme, Núm. 170 del 12 de agosto de 1988, 3 L.P.R.A. sees. 2101 y sigs., y la Ley Núm. 116 del 22 de julio de 1974,4 L.P.R.A. sees, lili y sigs.
4. Debemos señalar que el Manual sobre el cual basó su decisión el tribunal apelado entró en vigor el 22 de enero de 2000 y no regía la determinación realizada el 13 de septiembre de 1999, la cual fue objeto de la demanda original. A esa fecha, estaba en vigor el Manual de Reglas para crear y definir funciones del Comité de Clasificación y Tratamiento de Instituciones Penales, de fecha 27 de febrero de 1979, Núm. 2485, que no ha sido derogado expresamente. Aunque se crearon Manuales de Clasificación de Confinados en 1989 y 1995, éstos no fueron registrados ante el Departamento de Estado, de modo que no tuvieron el efecto de sustituir el Manual de 1979. Pueblo v. Amador Rodríguez, 2000 J.T.S. 111 (Res. el 27 de junio de 2000). Esto no tiene efecto sobre el recurso que nos ocupa, pues la sentencia impugnada sólo trata sobre la acción tomada el 5 de abril de 2000 por Corrección, que fue posterior a la vigencia del Manual del 22 de enero de 2000.